Argued 9 January; decided 27 February, 1899.

## SIEVERS v. BROWN.

[45 L. R. A. 642; 56 Pac. 171.]

1. RIGHT CONFERRED BY BOND FOR DEED.*—A bond for a deed transfers to the obligee an equitable interest in the land agreed to be conveyed, the legal title remaining with the obligor in trust for the purchaser.

2. BOND FOR DEED—RIGHT OF GRANTEE TO POSSESSION.—Unless particularly specified, a bond for a deed does not entitle the obligee to possession, and if he takes possession without consent, he is a trespasser.

3. RENT FOR POSSESSION UNDER A BOND.—Where the obligee in a bond for a deed takes possession, the payment of interest on deferred installments of the purchase price is usually sufficient compensation for the use of the premises until the maturity of the debt under the bond.

4. VENDOR AND PURCHASER—EFFECT OF REFUSAL TO PAY.—A vendee in possession of real property under a contract for its purchase is liable to the vendor for the reasonable rent thereof from the date of his refusal to carry out the contract.

5. EFFECT OF FORECLOSURE ON TENANT'S RIGHTS.—The rights of a tenant are not affected by a foreclosure until the delivery of the sheriff's deed after confirmation of the sale.

6. FORFEITURE UNDER BOND FOR DEED.—The obligor in a bond for a deed cannot demand compliance with the contract by the obligee, or declare a forfeiture for a breach thereof, until he is himself prepared to comply with its terms, and has tendered a deed.

7. VENDOR AND PURCHASER—TERMINATION OF TENANCY.—The tenancy at will initiated between a vendor and vendee of real property by the failure of the latter to carry out the contract of sale is terminated by a tender of compliance therewith by the vendor, coupled with the ability to make good the tender.

8. VENDOR AND VENDEE—EMBLEMENTS.—A vendee who is in possession of real property as a tenant at will under a bond for a deed, the terms of which he has broken, is entitled to the crops sown thereon before such tenancy was ended, but not to such as were sown after notice to quit.

9. WHAT IS NOTICE TO QUIT.—The commencement of a suit to foreclose a bond for a deed, is equivalent to a notice to the vendee in possession to quit, within the terms of Section 3523, Hill's Ann. Laws, giving a tenant the right to harvest a crop sown before receiving a notice to quit.†

From Marion :   GEORGE H. BURNETT, Judge.

---

*NOTE.—As to the interest obtained by a bond for a deed, see the opinion in *Security Savings Co.* v. *Mackenzie*, 33 Or. at pp. 211 and 214; *Gray* v. *Perry*, 25 Or. 1, and *Sayre* v. *Mohney*, 30 Or. 328.—REPORTER.

†NOTE.—This section reads as follows: "When the leasing is for the purpose of farming, the tenant * * * shall have free access to * * * gather any crop planted or sown by him before the service of notice to quit."—REPORTER.

This is an action by Henry H. Sievers to recover the value of certain crops grown by him on the land of Samuel B. Brown, but appropriated by the latter to his own use. The transcript shows that plaintiff, having agreed to purchase from defendant a tract of land in Marion County for the sum of $3,200, paid of the purchase price, on September 8, 1892, the sum of $600, and executed his promissory note for the balance, payable in eight years, in annual installments of $325, which note provided that, if default should be made in the payment of any of said installments when they severally matured, defendant might elect to consider and treat the whole sum as then due and payable ; that, in consideration of said payment and promise, defendant executed to plaintiff a bond for a deed, whereby he covenanted, upon the payment of said note, to convey the premises, by a good and sufficient deed, free from all incumbrances, and plaintiff, by defendant's license, entered into possession thereof ; that, on the maturity of the first installment, defendant demanded payment of the same, but plaintiff, claiming that the land was not correctly described in the bond, and that defendant's title thereto was defective, refused to comply therewith ; that defendant instituted a suit in the Circuit Court of Marion County against the heirs of his grantors, and obtained a decree correcting the description, and, having otherwise perfected his title to the premises, he executed and tendered to plaintiff a deed thereof, and demanded payment of said note, but plaintiff refused to pay any part thereof, whereupon defendant commenced a suit in said court against him, and obtained a decree correcting the description contained in the bond, foreclosing plaintiff's equitable interest in the premises, which were ordered sold, and the purchaser put in the immediate possession thereof, in pursuance of which the sheriff of said county

sold the land to defendant, and on July 31, 1894, evicted plaintiff therefrom, and restored the possession to defendant, though the sale was not confirmed until the sixth of November, following; that when said land was sold there was a quantity of wheat and oats growing thereon of the reasonable value of $92.66, and vegetables of the value of $75, and a lot of hay cut from said premises stored in the barn, all of which defendant appropriated to his own use. The cause being at issue, a trial was had, and the jury, in pursuance of the court's instructions, found that plaintiff was only entitled to the sum of $37.50, the value of the hay, and, judgment having been rendered thereon, plaintiff appeals.

AFFIRMED.

For appellant there was a brief over the name of *Mitchell, Tanner & Mitchell,* with an oral argument by *Mr. Albert H. Tanner.*

For respondent there was a brief over the name of *Holmes & Kellogg,* with an oral argument by *Mr. William H. Holmes.*

MR. JUSTICE MOORE, after making the foregoing statement of facts, delivered the opinion.

It is contended that, if the crops be regarded as part of the realty, no title thereto vested in defendant under the foreclosure proceedings until the sheriff's deed was executed; that plaintiff, having planted them, was the owner thereof; and that defendant, having converted them to his own use, is liable for their value.

1. A bond for a deed transfers to the obligee an equitable interest in the premises agreed to be conveyed, which is measured by the amount paid on account of the

purchase.   The legal title remains in the obligor, in trust
for the purchaser, who, upon payment of the entire con-
sideration, acquires the whole equitable interest, and
may maintain a suit to compel the specific performance
of the contract, if the obligor refuse to keep his cove-
nants.   In *Lysaght* v. *Edwards*, 2 Ch. Div. 499, JESSEL,
M. R., in commenting upon the purport of an agreement
to convey real property, and the method of foreclosing
the purchaser's equity, says :  "It appears to me that the
effect of a contract for sale has been settled for more than
two centuries.   Certainly it was completely settled before
the time of Lord Hardwicke, who speaks of the settled
doctrine of the court as to it.   What is that doctrine?
It is that, the moment you have a valid contract for sale,
the vendor becomes, in equity, a trustee for the purchaser
of the estate sold, and the beneficial ownership passes to
the purchaser; the vendor having a right to the purchase
money, a charge or lien on the estate for the security of
that purchase money, and a right to retain possession of
the estate until the purchase money is paid, in the ab-
sence of express contract as to the time of delivering pos-
session.   In other words, the position of the vendor is
something between what has been called a naked or bare
trustee, or a mere trustee (that is, a person without ben-
eficial interest), and a mortgagee who is not, in equity
(any more than a vendor), the owner of the estate, but
is, in certain events, entitled to what the unpaid vendor
is, viz., possession of the estate, and a charge upon the
estate for his purchase money.   Their positions are analo-
gous in another way.   The unpaid mortgagee has a right
to foreclose ; that is to say, he has a right to say to the
mortgagor, 'Either pay me within a limited time, or you
lose your estate,' and in default of payment he becomes
absolute owner of it.   So, although there has been a
valid contract of sale, the vendor has a similar right in

a court of equity. He has a right to say to the purchaser, 'Either pay me the purchase money, or lose the estate.' Such a decree has sometimes been called a decree for cancellation of the contract. Time is given by a decree of the court of equity, or now by a judgment of the high court of justice ; and, if the time expires without the money being paid, the contract is canceled by the decree or judgment of the court, and the vendor becomes again the owner of the estate.''

It will be observed, from the language quoted, that in England, if the vendee, under a contract for the purchase of real property, make default in the payment of the purchase money, the vendor may maintain a suit to cancel the contract, which is equivalent to a strict foreclosure. In *Button* v. *Schroyer*, 5 Wis. 598, it was held that a decree foreclosing a contract for the conveyance of real property, which ordered a sale of the premises, was erroneous, the court saying : ''The proper decree in such cases is that the money due upon the contract be paid within such reasonable time as the court may direct, or that the vendee be foreclosed of his equity of redemption.'' To the same effect is the case of *Baker* v. *Beach*, 15 Wis. 99. The justice of the rule, announced in England and followed in Wisconsin, may well be doubted, and particularly so when the vendor has received a large portion of the purchase money ; in which case equity would seem to demand that the premises be sold to satisfy the balance due on the contract, upon the payment of which the vendee should be entitled to the remainder of the money derived from such sale.* But whatever the proper rule may be, the consideration of the decree in the foreclosure proceedings does not seem to be necessary in the determination of this cause.

---

*Note.—In this connection see *Security Savings Company* v. *Mackenzie*, 33 Or. at pp. 212-214, and *Gray* v. *Perry*, 25 Or. at p. 6.—Reporter.

2. An examination of the transcript shows that the sheriff, obeying the mandate of the court, sold the land to defendant, which sale was thereafter confirmed by the court, and, in the absence of an appeal from said decree, it must be assumed that defendant did not acquire plaintiff's equitable interest in the premises until he procured the sheriff's deed thereto. Such interest not having been barred when plaintiff was evicted, it becomes important to consider the relation that existed between the parties under the contract. A bond for a deed, unless so specified therein, does not entitle the obligee to take possession of the premises, and hence, if he enter without the obligor's license, express or implied, he is a trespasser : *Williams* v. *Forbes,* 47 Ill. 148 ; *Chappell* v. *McKnight,* 108 Ill, 570 ; *Druse* v. *Wheeler,* 22 Mich. 438.

3. When possession is given, however, either by the bond or the obligor's license, it is understood, in the absence of any stipulation to the contrary, that the payment of interest on the deferred installments of the purchase price affords an ample consideration for the use and occupation of the premises : *Cleveland* v. *Burrill,* 25 Barb. 532 ; *Parke* v. *Leewright,* 20 Mo. 85 ; *Hundley* v. *Lyons,* 5 Munf. 342 ; *Hepburn* v. *Dunlop,* 14 U. S. (1 Wheat.) 179.

4. It has been held that a purchaser in possession of real property under the vendor's license cannot be evicted, so long as he offers to perform the conditions of his agreement (*Whittier* v. *Stege,* 61 Cal. 238) ; but, if he refuses to comply therewith, the vendor may treat him as a tenant at will (*Harris* v. *Frink,* 49 N. Y. 24, 10 Am. Rep. 318) ; and he thereby becomes liable to the vendor for the reasonable value of the use of the premises for the time during which he continues in possession after he abandons the agreement (*Smith* v. *Wooding,* 20 Ala. 324 ; *Osgood* v. *Dewey,* 13 Johns. 240 ; *Dwight*

v. *Cutler*, 3 Mich. 566, 64 Am. Dec. 105 ;   *Hogsett* v. *Ellis*, 17 Mich. 351 ;   *Gould* v. *Thompson*, 4 Metc. [Mass.] 224). The application of this rule would render plaintiff liable to defendant for the reasonable rent of the land from the time the relation of vendor and purchaser was abrogated by the former's refusal to keep his agreement.

5.   As a corollary from this plaintiff would undoubtedly be entitled to the crops grown thereon, as emblements, unless the relation of landlord and tenant was terminated, for it has been held that a tenant is not affected by a foreclosure till the sale is consummated and the deed delivered :   *Whalin* v. *White*, 25 N. Y. 462 ;   *Allen* v. *Elderkin*, 62 Wis. 627 (22 N. W. 842).

6.   The relation of vendor and purchaser was undoubtedly severed, and that of landlord and tennant inaugurated, September 8, 1893, when plaintiff refused to pay the first installment due under the contract ; but plaintiff's repudiation of his agreement did not authorize defendant to declare a forfeiture until March, 1894, when he was ready and able to convey the premises according to the terms of his bond :   *Mix* v. *Beach*, 46 Ill. 311 ; *Peck* v. *Brighton Co.*, 69 Ill. 200.

7.   Defendant, in March, 1894, having tendered a deed, and demanded payment of the amount agreed upon, plaintiff's refusal to comply therewith was tantamount to a declaration of forfeiture, which terminated the tenancy existing between the parties.

8.   This being so, the decision must hinge upon the question whether the crops were planted before or after that date. In *Samson* v. *Rose*, 65 N. Y. 411, it is held that one whose estate is terminated by his own act or default is not entitled to emblements. In *Harris* v. *Frink*, 49 N. Y. 24 (10 Am. Rep. 318), Mr. Justice RAPALLO, in commenting upon the right of a vendee to take the crops grown upon the premises of which he was in possession

under a contract of purchase, says : "If he makes default in his contract of purchase, or commits waste, or in any other manner terminates the tenancy by his own wrongful act, he becomes a trespasser, and may be sued as such, or in ejectment, and he cannot dispute the title of the party under whom he entered (*Cooper* v. *Stower*, 9 Johns. 331; *Dolittle* v. *Eddy*, 7 Barb. 74; *Whiteside* v. *Jackson*, 1 Wend. 418; *Leonard* v. *Pitney*, 5 Wend. 30; *Jackson* v. *Stewart*, 6 Johns. 34 (8 Am. Dec. 293); *Quackenboss* v. *Lansing*, 6 Johns. 49); and he would, no doubt, forfeit his right to emblements under those circumstances." See, also, *Stewart* v. *Doughty*, 9 Johns. 107; *Whitmarsh* v. *Cutting*, 10 Johns. 360; *Powers* v. *Ingraham*, 3 Barb. 576. "It is true," says Mr. Justice FOLGER in *Reeder* v. *Sayre*, 70 N. Y. 180 (26 Am. Rep. 567), "that a tenant, holding by a tenure which is uncertain as to the time at which it will cease, is entitled to take off, after it has ceased, the crops which he has sowed in the course of husbandry. But if it is certain at the time when he sows how long it will continue, and it is plain that he cannot, before it ceases, reap that which he may sow, then it is his own folly if he sows (per Lord MANSFIELD, *Wigglesworth* v. *Dallison*, 1 Doug. 201), and he will not be permitted to reap. This rule does not give to the tenant any right by reason of his having ploughed, manured, or otherwise prepared the ground for the seed, if he has not sowed."

9. There is no evidence in the bill of exceptions tending to show when the seed was planted or sowed, and, this being so, it must be presumed, in view of the judgment, that the crops were not put in until after the tenancy was terminated by the commencement of the suit to foreclose the bond, which was equivalent to a notice to quit : Hill's Ann. Laws, § 3523. No error hav-

ing been committed by the introduction in evidence of the judgment roll, or by giving the instructions complained of, it follows that the judgment is affirmed.

AFFIRMED.

Decided 16 January; rehearing denied 13 February, 1899.

## VAN WINKLE *v.* CRABTREE.

[55 Pac. 831; 56 Pac. 74.]

1. ELECTIONS—CONSTRUCTION OF LAW.—The provisions of the election act generally known as the Australian Ballot Law relating to the space in which the marking of the ballots shall be done are mandatory, although there is no provision rendering void a ballot not marked in the prescribed manner.

2. IDEM—SPACE FOR DISTINGUISHING MARK.—Where an election law requires the elector to indicate his choice by a mark, the ballot should be counted if the mark is made anywhere in the space occupied by the name of the chosen candidate, so long as it does not obliterate such name.

3. VOTING MARKS ON BALLOTS.—Where an election law requires the voter to place a mark opposite the name of the candidate voted for, but does not define the character of such mark, a ballot should not be counted for either candidate where it contains a cross at the left of the name of one candidate, and at the left of the name of a rival candidate a single downward slanting stroke of the pencil, from left to right, crossed by a waving or curved line.

4. IDEM.—Under such an act, ballots marked opposite the names of all the candidates but one for a certain office, and not having any mark opposite his name, cannot be counted for the latter.

5. IDEM.—In view of such an election law, ballots having pencil lines drawn through the names of all the candidates for an office except one cannot be counted for the latter.

6. IDEM.—Where an elector has, with one exception, voted for the candidates of one party, and in that one instance has placed a mark on the line dividing the space between two candidates, the center of the mark being slightly inside the space of the candidate of the party for which he has cast his other votes, the ballot is properly counted for the latter; since, considering the tendency of electors to vote a partisan ticket, the elector's intention to vote for his party's candidate can be ascertained therefrom.

7. IDEM.—Under the Oregon law, a ballot should not be counted for a candidate at the left of whose name appears a cross, where two pencil lines are drawn through his name indicating that the voter had changed his mind after making the cross.

8. ELECTION CONTESTS—TESTIMONY OF ILLEGAL VOTERS.—The testimony of illegal voters as to the person for whom they voted is admissible in an election contest, where they voted in the belief that they had the right to do so; and the ballots cast by such persons may be deducted from those credited to their candidates.

9. VOTING MARKS ON BALLOTS.—Ballots bearing any mark in a given space should be counted for the candidate in whose space the mark is made, though parts of such marks extend into other spaces.

10. IDEM.—Where an elector, with one exception, voted for the candidates of one party, and the mark opposite that party's candidate for one office extended through the space reserved for his name, both above into the space containing the name of the office, and below into the space reserved for another candidate's name, the ballot is properly counted for the former, the elector's intention to vote for him being ascertainable therefrom.

11. DISTINGUISHING MARKS—REJECTING BALLOT.—A ballot on which an elector wrote in the space appropriated to candidates the name of a person for whom he desired to vote (such person not being a listed candidate) should not be rejected as bearing a distinguishing mark, under section 67 of the election law providing a punishment for voters who thus mutilate their ballots, notwithstanding it is possible that the name so written might afford a means of identifying the voter.

12. PRESUMPTION FROM BALLOT—There is no presumption that a person was not a resident of the precinct where he voted because he did not vote for precinct officers, though his ballot was endorsed "State, county, and dis't."

13. DISTINGUISHING MARK RENDERING BALLOT VOID.*—Under Laws, 1891, p. 8, § 67, as amended by Laws, 1895, p. 68 (Hill's Ann. Laws, p. 1169), prescribing a punishment for electors who place a distinguishing mark on their ballots so that the same may be identified, a ballot having the mark "O K" written on a blank space, beneath a set of candidates, is void.

14. IDEM.—Ballots having the words "voted for" written thereon after the name of one of the candidates, in addition to the required voting mark, carry a "distinguishing mark," which renders them void under the election law.

15. ELECTION CONTESTS—QUESTIONS REVIEWED ON APPEAL.—An appeal to the supreme court from a judgment upon the trial of an election contest does not bring up the cause for trial *de novo*, but the questions presented for review are the conclusions of law from the findings of fact.

16. VOTING MARKS ON BALLOTS.—Under an election law which provides for indicating the voter's choice by a mark in the space where the candidate's name is printed, or by writing the name of the chosen person if it does not appear on the printed sheet, a ballot having the names of all the candidates for a certain office marked out, and then one of such names written in a blank space left for extra names, cannot be counted at all; nor can a ballot having a line drawn through the name of each candidate of one party.

---

*NOTE.—See an exhaustive note on Distinguishing Marks which Invalidate Ballots under the Australian System with *Taylor* v. *Bleakley*, 49 Am. St. Rep., p. 240, S. C. 28 L. R. A. 683. The following cases consider to some extent the same question: *Miller* v. *Pennoyer*, 23 Or. 364, and note; *Whittam* v. *Zahorik*, 51 Am. St. Rep. 317, 329; *Lankford* v. *Gebhart*, 51 Am. St. Rep. 585, 587; *Dennis* v. *Caughlin*, 58 Am. St. Rep. 761 (29 L. R. A. 731); *Tebbe* v. *Smith*, 29 L. R. A. 673 (49 Am. St. Rep. 68); *Buckner* v. *Lynip*, 30 L. R. A. 354; *Parker* v. *Orr*, 30 L. R. A. 227; *Sego* v. *Stoddard*, 22 L. R. A. 468.

Stickers or Pasters were Allowed in the following cases: *Dewalt* v. *Bartley*, 15 L. R. A. 771 (28 Am. St. Rep. 844); *People ex rel.* v. *Shaw*, (under a statute) 16 L. R. A. 606; but were Disallowed in these cases: *State ex rel.* v. *Walsh*, 17 L. R. A. 364; *Re Contested Election of Little Beaver Township*, 27 L. R. A. 234; *Fletcher* v. *Wall*, 40 L. R. A. 617.—REPORTER.

ELECTION CONTEST—REVIEW—HARMLESS ERROR.—A judgment in an election contest will not be reversed because the court erroneously counted a void ballot for respondent, where it also counted void ballots for appellant, so that in spite of its error, the judgment is correct; and this even where respondent did not appeal, since it is the duty of the appellate court to declare the law applicable to the facts, and correct any error apparent on the record, whether it is complained of or not.

From Linn : HENRY H. HEWITT, Judge.

This is a special proceeding, under Section 2544, Hill's Ann. Laws, to contest the defendant's right to the office of Clerk of Linn County, to which he was declared elected by the county canvassing board. On the official ballot used in said county at the last general election the names of the candidates for the office of county clerk were arranged in the following order :

| For County Clerk. | Vote for One. |
| --- | --- |
| 70. Frank Crabtree of Linn County | People's-Democratic-Silver-Republican |
| 71. E. E. Lange of Linn County | Regular People's |
| 72. J. M. Marks of Linn County | Prohibition |
| 73. J. S. Van Winkle of Linn County | Republican |

The plaintiff alleges that in certain designated precincts of said county the judges and clerks of election therein returned as cast for him a certain number of votes, but that he received in each of said precincts a greater number than were so counted for him, and prays that said ballots may be recounted, and that he be declared elected to said office. The defendant denies the material averments contained in plaintiff's notice of contest, and alleges, in substance, that there were counted as cast for him in said precincts but one thousand nine hundred and twenty-one votes for said office, when in fact there were polled for him a greater number than were so counted ; that plaintiff was credited with having received one thousand nine hundred and twenty votes ; and that such number was in excess of the legal

votes actually cast for him.    It is also alleged, *inter alia,*
that Harry Boyle and Fred Gross voted illegally at said
election, and that said votes were counted for plaintiff.
The reply having put in issue the allegations of new
matter contained in the answer, a recount was ordered;
but the court refused to receive in evidence or to count
twenty-five ballots which plaintiff claims were cast for
him, and received in evidence and counted for defendant
eleven ballots to which plaintiff claims he was not en-
titled.    Copies of the ballots so rejected, numbered con-
secutively from 1 to 25, inclusive, and of those counted
for defendant, numbered from 26 to 36, inclusive, are
set out in the bill of exceptions;    and the original bal-
lots, except No. 4, are also sent up with the transcript
for inspection.    Ballot No. 1 is marked with an X im-
mediately to the left of Van Winkle's name, and also
with a slanting stroke, made by a downward movement
of the pencil, from left to right, between the number
"70" and the name of "Frank Crabtree," which stroke
appears to have been somewhat obliterated by a waving
pencil line drawn over the same from the top to the bot-
tom.    Twelve ballots, numbered, respectively, 2, 5, 6, 7,
13, 14, 15, 17, 18, 19, 22, and 25, are marked with an X
between the numbers "70," "71," and "72" and the cor-
responding candidates' names, thereby leaving no mark
whatever between the number "73" and the name of
"J. S. Van Winkle."    Ballot No. 3 is marked in the
same manner as the twelve ballots just described, except
that between the number "73" and the name of "J. S.
Van Winkle" the surface of the paper appears to have
been abraded, as though the elector made in the space
indicated a mark, which he erased with a knife or other
sharp instrument.    Ballot No. 8 is marked in the same
manner as said twelve ballots, and, in addition thereto,

contains curving lines placed after the word "county," appended to the names of Crabtree, Lange, and Marks. Ballot No. 20 contains an X placed to the right of each of the candidates' names, except plaintiff's.

Ballots numbered 9, 21, and 24 are marked by pencil lines through all the candidates' names, county of residence, and political designation, except that of plaintiff. Ballot No. 16 contains a pencil mark drawn through all the candidates' names and their county residence, except plaintiff's, leaving their several party designations unmarked. Ballot No. 23 contains a pencil mark drawn through Crabtree's Christian name, and through the initials of Lange and Marks, leaving plaintiff's name unmarked. Ballot No. 4 has lines drawn through each of the·party designations, except the word "Republican." Ballot No. 10 is marked in the same manner as ballot No. 1, except that the stroke thereon is made with a downward movement from right to left, and has no waving lines drawn over it. Ballot No. 11 is marked with an "X," the center of which appears to be a shade above the line between the names of Marks and Van Winkle; and ballot No. 12 has an "X" immediately to the left of, and also two pencil lines drawn through, Van Winkle's name. Ballot No. 26 has a horizontal line drawn through "70," the space to the right thereof, and most of the letters in the word "Frank." No. 27 has a horizontal line drawn immediately below the word "Frank." No. 28 has an "X" to the left of Crabtree's name, and also a horizontal pencil line about one-sixteenth of an inch in length immediately to the left of Lange's name. No. 29 contains an "X," the center of which appears to be a shade above the line between the names of Crabtree and Lange. No. 30 is marked by a nearly perpendicular line, extending through spaces Nos. 70 and 71, which is bisected by a nearly horizontal

line, extending from Crabtree's name. No. 31 has an "X" after the word "county," in space No. 70. No. 32 is like No. 31, with the addition of a similar mark to the left of Crabtree's name. No. 33 contains a mark which fills space No. 70, and a part of space No. 71, with the "X" apparently crossing on the line between the names of Crabtree and Lange. No. 34 is properly marked as indicating the elector's intention to vote for Crabtree; and it also contains the name "G. Bradley," written after the printed name of "W. W. Sanders," candidate for constable. No. 35 is properly marked as having been cast for Crabtree, and also contains the letters "O. K." written with a pencil in the space reserved for a candidate for the office of Attorney-General; and No. 36 is properly marked as having been cast for Crabtree, but on the back of the ballot there is indorsed the words, "State, county & Dis'ct."

Testimony having been admitted to show that H. R. Boyle (described in the answer as Harry Boyle) was not a citizen of the United States, or of the State of Oregon, and that J. F. Gross (mentioned in the answer as Fred. Gross) was not a resident of Crawfordsville Precinct, Linn County, Oregon, on the day of election, the court, over plaintiff's objection and exception, permitted said Boyle and Gross to testify that at said election each voted for Van Winkle for the office of county clerk. The court, deducting the votes so cast by Boyle and Gross from the number apparently cast for Van Winkle, found that he had received one thousand nine hundred and twelve, and the defendant one thousand nine hundred and thirteen, legal votes for the office of clerk of said county; whereupon the action was dismissed, and plaintiff appeals.

Affirmed.

For appellant there was a brief over the names of *Henry H. Hewitt, A. M. Cannon, Percy R. Kelly, J. N. Duncan,* and *N. M. Newport,* with an oral argument by *Messrs. Hewitt, Kelly,* and *Newport.*

For respondent there was a brief over the names of *James K. Weatherford, H. C. Watson, W. R. Bilyeu,* and *J. J. Whitney,* with an oral argument by *Messrs. Watson* and *Bilyeu.*

Mr. Justice Moore, after making the foregoing statement of the facts, delivered the opinion of the court.

It is contended by plaintiff's counsel that, by giving to the statute providing for the marking and counting of ballots cast at a general election the liberal construction to which it is entitled, an inspection of the twenty-five ballots which were rejected shows that the several electors who cast them intended thereby to vote for Van Winkle, and hence the court erred in refusing to count them for him.

A general statement of the provisions of the Australian Ballot Law, so far as applicable to the facts involved, is deemed essential to a clear understanding of the questions presented for consideration. An act of the legislative assembly approved February 13, 1891 (Laws, 1891, p. 8), appears in Hill's Ann. Laws, at p. 1169 *et seq.,* and provides that the white official ballot shall have printed thereon in bold-faced type the words, "Mark between the number and name of each candidate or answer voted for." The ballots shall be printed so as to give each elector a clear opportunity to designate his choice of candidates by making a mark to the left of the name of the candidate he wishes to vote for : Section 49, as amended by the act approved February 23, 1895 (Laws,

1895, p. 68).   The elector shall prepare his ballot by marking immediately to the left of the name of the candidate of his choice for each office to be filled, or by writing in the name of the person he wishes to vote for, which shall be done with an indelible "copying" pencil, or with pen and ink : Section 59, as amended by the act of February 23, 1895.   If an elector, by accident or mistake, spoils his ballot, so he cannot conveniently vote the same, he may, on returning said spoiled ballot, receive another in place thereof : Section 62.   The county clerk is required to provide for each election precinct in his county two ballot boxes, one of which shall be marked "General," and the other "State and District," respectively : Section 59.   If a majority of the judges of election are satisfied the elector is legally qualified to vote in that precinct only for "State" officers, the chairman shall immediately write with pen and ink upon the back of the ballot the word "State," and sign his (the chairman's) initials thereto.   If the elector is qualified to vote for district officers also, the chairman shall write as aforesaid the words "State and District."   In either such case the ballot shall then be deposited in the box marked "State and District :"   Section 61.   In the canvass of votes, any ballot from which it is impossible to determine the elector's choice for any of the officers shall be void, and shall not be counted :   Section 27.   Any ballot from which it is possible to determine the elector's choice for a part of the officers shall be counted for such part. The judges shall disregard misspelling or abbreviation of the names of candidates for office, if it can be ascertained from such ballot for whom it was intended :   Section 29.   Any elector who shall place any distinguishing mark upon his ballot, whereby the same may be identified, upon conviction shall be punished by a fine of not less than $50 nor more than $200 :   Section 67.

1.   If the provisions of the statute relative to marking ballots are mandatory, no error was committed in rejecting the twenty-five ballots complained of ; but plaintiff's counsel argue that it can be ascertained from an inspection of the ballots for whom the elector intended to vote, and that the provision in relation to the counting of the votes cast renders the method of marking the ballots directory only, and hence they should have been counted for plaintiff.   Under the provisions of section 49 of the act prior to its amendment, the elector was required to express his preference for the candidates whose names were printed on the official ballot by canceling or marking out the names of those who were not his choice ;   and it is claimed that the original method induced the electors to express their choice for plaintiff by marking out, or by placing a cross or other mark to the right or left of, the names of all other candidates for that office, and that the original mode of marking ballots, under the very liberal rule prescribed in section 29, should be controlling in determining the elector's choice as evidenced by the marks upon most of the ballots rejected.   Every elector who performs the act of voting is presumed to know the law of his state applicable to the exercise of the right of suffrage ;   and, if he fails to comply with its provisions, his mistake or ignorance deprives him of the benefit to be derived from the practice of such right.   This being so, his right to have his choice declared as he intended must depend upon his compliance with the law applicable thereto in force on the day of the election   While the Australian ballot system is designed to purify elections by securing to the voter the prerogative of freely and privately selecting the candidates of his own choice, the law is also well calculated to promote the cause of general education, by compelling the masses to learn to read and write as a

condition precedent to the exercise of the right of suffrage, and to punish the illiterate by compelling them to admit their ignorance in public by asking aid in the preparation of their ballots.    To give effect to this latter purpose of the law, which is almost as important as its primary object, the statute should receive a reasonably strict construction.

While there is a conflict of judicial utterance upon the question as to whether, in the absence of a statute rendering a ballot void which is not marked in the prescribed manner, we believe the better reason supports the rule that the provisions of the act, so far as they relate to the space in which the marking should be done, should be construed as mandatory :    McCrary, Elec. (4 ed.), § 720 ;    *Attorney-General* v. *McQuade*, 94 Mich. 439 (53 N. W. 944) ;    *Attorney-General* v. *May*, 99 Mich. 538 (58 N. W. 483);    *Whittam* v. *Zahorik*, 91 Iowa, 23 (57 Am. St. Rep. 317, 59 N. W. 57);    *Parvin* v. *Wimberg*, 130 Ind. 561 (30 Am. St. Rep. 254, 15 L. R. A. 771, 30 N. E. 790) ;    *Bechtel* v. *Albin*, 134 Ind. 193 (33 N. E. 967) ; *Sego* v. *Stoddard,* 136 Ired. 297 (22 L. R. A. 468, 36 N. E. 204);    *Curran* v. *Clayton*, 86 Me. 42 (29 Atl. 930);    *People* v. *Board of Canvassers of Onondaga Co.*, 129 N. Y. 395 (14 L. R. A. 624, 29 N. E. 327).    In *Bechtel* v. *Albin*, 134 Ind. 193 (33 N. E. 967), Mr. Justice HACKNEY, in construing a similar statute of Indiana, says :    "That the legislature intended a strict observance of the rule so provided is further shown in the provision that if, in an attempted compliance, the voter, by accident or mistake, spoils, defaces, or mutilates his ballot, he can have another."

2.    True, the statute reads : "Any ballot from which it is possible to determine the elector's choice for a part of the officers shall be counted for such part, but the remainder of the ballot from which it is impossible to

determine the elector's choice shall be void as to such defective part, and such defective part shall not be counted:'' Section 29. This clause, however, must be construed in the light of the provisions relating to marking the ballot for the particular candidate of the elector's choice. The voter, under the present act, manifests his selection by a mark, and not by the absence of one; hence it would seem that, notwithstanding the law prescribed that the mark should be made immediately to the left of the name of the candidate voted for, the vote should be counted if the mark was made anywhere in the space occupied by the name of the candidate of the elector's choice, so long as it did not obliterate such name. If a voter were to write on his ballot, "I hereby vote for each republican candidate on this official ballot," no intelligent person could possibly mistake his intention as thus expressed; but it is not to be supposed, under the very liberal provisions of section 29, that such a ballot would be counted for any candidate of that party, because the Australian Ballot Law requires of the voter a comparison of the integrity, morality, and fitness of the various candidates of each party for the offices to be filled, and a conclusion thereon that the particular candidates whom the elector selects fill the measure of these several necessary requirements. In view of these rules, we will examine the ballots which were rejected by the court.

3. It will be remembered that ballot No. 1 contains to the left of Crabtree's name a single downward slanting stroke of the pencil, made from left to right, over which a waving or curved line is made with the pencil, and also contains an "X" to the left of Van Winkle's name. The statute has not prescribed the character of the mark which an elector should make as indicative of his choice of candidates; and, this being so, the ballot in question

is as well marked for Crabtree as for Van Winkle; and hence no error was committed in rejecting it. Ballot No. 10 has a slanting pencil line, made with a downward stroke, from right to left, which is placed to the left of Marks' name, and also has an "X" placed to the left of Van Winkle's name; and, being like ballot No. 1 in respect to the mode of marking, it was properly rejected.

4.  Ballots numbered, respectively, 2, 3, 5, 6, 7, 8, 13, 14, 15, 17, 18, 19, 20, 22, and 25, contain no marks whatever in the space occupied by Van Winkle's name, and hence no error was committed in rejecting them.

5.  Ballots numbered 4, 9, 16, 21, 23, and 24, having pencil lines drawn through the names of all the other candidates except Van Winkle's, were not admissible in evidence as tending to prove plaintiff's right to the office; and no error was committed in refusing to count them.

6.  In ballot No. 11 the point at which the lines of the "X" cross each other appears to be situated above the printed line which separates the names of Marks and Van Winkle. The mark on this ballot plainly illustrates the rule, as the writer understands it, for determining the elector's choice, as prescribed in section 29, when any doubt exists in that respect. It shows that the person who cast it voted for every Prohibition candidate but one whose name appeared upon the official ballot. Experience demonstrates that the average voter is more of a partisan than a patriot; or rather, perhaps, his bias unconsciously leads him to conclude that true patriotism at the polls is evidenced by an expression of his choice for each of the candidates nominated by the party of which he is a member, and that the persons so named by his party are, to his mind, superior in intelligence, in probity, and in business capacity, to any other candidates nominated by opposing parties for the offices to be filled

at the election. Those officers who are called upon to determine the result of the election from an inspection of the ballots cast thereat, must necessarily consider this peculiar trait of human character, whenever any doubt exists in relation to the expression of the elector's choice of candidates for office. Invoking this rule, and considering that the center of the "X" is situated above the printed line separating the names of Marks and Van Winkle, we think it is possible to determine from an inspection of the ballot that the elector who cast it chose Marks, the Prohibition candidate, for the office of county clerk; and, this being so, no error was committed in refusing to count ballot No. 11 for plaintiff.

7. It would appear from an inspection of ballot No. 12 that the elector who cast it had voted for Van Winkle by making an "X" immediately to the left of his name, but, for some unexplained reason, changed his mind; and, to make his intention perfectly plain to the judges of election, he drew two pencil lines through Van Winkle's name. No error, in our judgment, was committed by the court in rejecting ballot No. 12.

8. It is contended by plaintiff's counsel that the court erred in permitting H. R. Boyle and J. F. Gross to testify that they voted for Van Winkle for the office of county clerk, and in deducting from the number of votes which he received the two so claimed to have been cast by them. The primary object of the Australian Ballot Law is to protect the elector from intimidation, to accomplish which the secrecy of the ballot must be preserved; and, therefore, if he be a qualified voter, he cannot be compelled to testify for whom he voted at any election. It is generally held, however, that this rule cannot be invoked to shield a person who is not a legal voter. The wisdom of such a conclusion might not at first seem apparent, for it may be assumed that, if a person voted

at an election when he knew he was not entitled to exercise the right of suffrage, he must have been prompted to do so from some unworthy motive ; and, if he would intentionally violate the law in the first instance, it might reasonably be inferred that he could be induced, when the result of the election was very close, to testify that he had voted for a candidate whom he desired to see defeated, when, in fact, he had voted for the candidate's opponent ; and thus, instead of correcting the wrong, he would be permitted to relieve the candidate of his original choice from a hostile vote.   Such would probably be the result if the person so voting knowingly intended to violate the law ; but every man is presumed to be innocent until he is proven to be guilty, and, indulging this presumption, Boyle, though not a citizen of the United States, nor having made any declaration of his intention to become such, may have believed that his father was naturalized before he attained his majority, and, upon becoming of age, he thereby became a legal voter.   So, too, it may have been that Gross, being ignorant of the election law, voted for county officers in Crawfordsville Precinct, of which he was not a resident, honestly thinking he had a legal right to do so.   If Boyle and Gross entertained the belief that might be attributed to them, their ballots, though illegal, were not superinduced by moral turpitude ; and under such circumstances it is reasonable to suppose that they would testify truthfully concerning their choice for county clerk, and hence they ought to be permitted to correct the error which they inadvertently committed.   That the majority of men are honest must be conceded ; and, such being the case, the greatest good may be expected to result from permitting persons who have voted illegally to testify concerning the candidates for whom they cast their ballots, notwithstanding that in

some instances the opposite result may follow. "There can be no doubt," says Mr. Justice STRAHAN, in *State ex rel.* v. *Kraft*, 18 Or. 550 (23 Pac. 663), "that one important object of the system of voting by ballot is secrecy, so that the voter may freely exercise his choice, uninfluenced by power, station, or the conditions by which he is surrounded; but this protection extends to the lawful voter only, and not to the spurious. It is the lawful voter around whom the law throws its protection, and not to him who assumes to exercise the sacred prerogative of a voter without being duly qualified." In support of the rule here announced, see McCrary, Elect. (4 ed.), § 490 *et seq.*; *People* v. *Pease*, 84 Am. Dec. 242, and notes at p. 269. The illegality of the ballots cast by Boyle and Gross having been established, the court committed no error in requiring them to testify concerning the persons for whom they attempted to vote, or in deducting from the votes cast for Van Winkle the ballots so given him by these witnesses.

9. We now come to the consideration of the ballots that were counted by the court as having been cast for the defendant. From what has already been said, it is apparent that ballots numbered 26, 27, 29, 30, 31, 32, and 33 were properly counted as having been polled for Crabtree.

10. Ballot No. 28 is marked immediately to the left of Crabtree's name with a heavy line, made by a downward stroke of the pencil, from right to left, and extending from a point above the printed line beneath the words "For County Clerk," to a point below the printed line beneath Crabtree's name. This heavy line is bisected near the middle of space 70 by a light line, made by a downward stroke of the pencil, from left to right, extending from about the same point above to about the middle of space 71. Joined to the left of this light line

is a heavier line, made by a downward stroke of the pencil, from left to right, commencing at about the same point above the printed line, beneath the words "For County Clerk," and terminating at a point where the heavy and light lines hereinbefore described intersect each other. Beneath this juncture, and joined to the light line, appear two other heavier lines, made to the right by a slightly downward or nearly horizontal stroke of the pencil, from left to right, the first being in space 70, and the second in space 71, extending from the lower point of the light line about one-sixteenth of an inch to a point in the first initial preceding Lange's name. This ballot, with but one exception, not considering the office of clerk, was cast for the People's-Democratic-Silver Republican candidates, which fact, being considered in connection with the fact that the several lines are so united as to constitute but one mark, leads us to conclude that it is possible to determine that defendant was the elector's choice for the office of county clerk, and that no error was committed by the trial court in counting this vote for Crabtree.

11. In ballot No. 34 the elector wrote "G. Bradley" in the space appropriated to the candidates for the office of constable, between and just a little below the printed name "W. W. Sanders" and the word "Democratic." It is insisted by plaintiff's counsel that the name so written on this ballot constitutes a distinguishing mark, and, this being so, the court erred in counting it as a vote for any purpose. Section 49 of the election law, so far as it relates to the arrangement of the ballot, reads: "There shall be left at the end of the list of candidates for each different office blank spaces in which the elector may write the name of any person not printed on the ballot, for whom he desires to vote as candidate for such office." Section 59 provides that the elector, upon receiving a

white ballot, shall forthwith retire to one of the compartments provided for that purpose, and there prepare his ballot, by marking the same, etc., "or by writing in the name of the person he wishes to vote for." It is evident that the elector, intending to avail himself of these provisions of the law, attempted to write the name of his choice for constable in the proper place, but, by mistake, inserted it in the space reserved for that of W.W. Sanders. It is possible that the name so written might afford the means of identifying the person who cast the ballot; but, since the elector had the right to express his preference by writing on the ballot the name of the candidate of his choice for the office of constable, we cannot think that his vote should be rendered void because it was written three-sixteenths of an inch above the line set apart for that purpose ; and hence the court committed no error in admitting said ballot in evidence, or in counting the vote for defendant.

12.   Ballot No. 36 has the following words indorsed thereon : "State, county & Dis'ct." It is maintained by plaintiff's counsel that, inasmuch as the person who cast this ballot did not vote for any candidates for the office of justice of the peace or constable, the indorsement in question shows that the elector was not a resident of the precinct in which he voted, and hence he had no right to vote for county officers, but having done so, the court erred in permitting the ballot to be offered in evidence, and in counting it as a vote for defendant. If it be admitted that the elector who cast this ballot was not a resident of the precinct in which he voted, he had no right to vote for county officers, for the organic law on that subject declares : "All qualified electors shall vote in the election precinct in the county where they may reside for county officers, and in any county in the state for state officers, or in any county of a congressional

district in which such electors may reside for members of congress:'' Const. Or. Art. 2, § 17.   The ballot of any elector who is entitled to vote for state, county, and district officers should be placed by the judges of election in the box marked ''General'' (Election Law, § 60); but, inasmuch as the bill of exceptions does not show that the ballot in question was placed in the ballot box marked ''State and District,'' the elector ought not to lose his right to vote for county officers because of such indorsement; and hence no error was committed in receiving said ballot in evidence, or in counting it as a vote cast for defendant.

13. In ballot No. 35, in a blank space immediately below the names of the candidates for ''Attorney General,'' appear the letters ''O K,'' written with an indelible pencil; and it is contended by plaintiff's counsel that these letters constitute a distinguishing mark, by which the ballot might be identified, thereby rendering it inadmissible in evidence, and, this being so, the court erred in counting the vote for defendant.   Section 67 of the election law prescribes a punishment for the elector who ''places a distinguishing mark upon his ballot whereby the same may be identified;''   but the law nowhere, in positive terms, provides that a ballot so marked shall be rendered void.   If it should be held, however, that a ballot which had been marked by the elector in such a manner as to render its identification certain was not void, because the statute had not, in positive terms, so prescribed, the effect would necessarily be the destruction of the secrecy of the ballot which the Australian system was designed to promote; for, by the use of a few letters of the alphabet or other characters, such a permutation could be arranged by those who would corrupt the purity of the ballot as would accommodate many thousand voters, thereby identifying the person

who cast each ballot so marked, and evidencing the performance of an illegal agreement to thwart the purposes of the law.

14.    The punishment of the voter would be wholly inadequate to correct the evil which such a method of marking the ballots would necessarily entail; for, if one honest vote were polled in each precinct, it would be extremely difficult to prove in an action that the person charged with illegally marking his ballot was guilty thereof; but, if it be held that the ballot so marked is void, the elector who cast it is punished to some extent by being disfranchised at the election when the illegal ballot was deposited, thereby promoting the secrecy which the law enjoins, and preventing the commission of the offense which public policy condemns.    In our judgment, the interest of the state demands that a ballot which has been marked in such a manner as to be identified should be declared void, and that our statute impliedly commands that such an effect should follow an illegal marking of a ballot.    In *State ex rel.* v. *Ellis*, 111 N. C. 124 (17 L. R. A. 382, 15 S. E. 938), it is held that the inscription "O K" upon the back of ballots is a device which renders them void under an act of the Legislative Assembly of North Carolina, which prescribes that ballots shall be "without device."    It is quite evident that the ballot in question can be identified by the distinguishing letters; and, it seeming to be conceded that the elector placed the marks on his ballot, it follows that the court erred in admitting it in evidence, and in counting it as a vote given for defendant.

15.    Considering only the errors assigned in the notice of appeal, and refusing to count ballot No. 35 for defendant, the consequence is a determination that each party received an equal number of votes; but whether this result affirms the judgment because plaintiff should

show a superior right to the office, is not necessary
to a decision of the case, for, in an appeal from a judg-
ment given by the court upon the trial of an election
contest, the cause is not tried here *de novo*, but the ques-
tion presented for review must necessarily be, are the
conclusions of law deducible from the findings of fact?
The respondent, being satisfied with the judgment ap-
pealed from, has not assigned any errors, in the absence
of which he cannot be heard to complain ; but, in modi-
fying the court's conclusions of law so as to work a
reversal of or seriously to affect the judgment, the
speedy settlement of the issue involved, which seems to
be necessitated by the statute (Hill's Ann. Laws, § 2547),
demands an examination of the conclusions of law which
are not complained of, if to do so would result in an
affirmance of the judgment, which must be presumed to
be correct. With these introductory remarks, we will
examine the findings of fact relative to certain ballots
which the court, as a conclusion of law, counted as
having been given to plaintiff.

16. On a ballot described in finding of fact number
six, the words "voted for" were written with an indeli-
ble pencil after the words "J. S. Van Winkle of Linn
County ;" and a mark was also made immediately to
the left of said name. Finding of fact number seven
describes a ballot which is marked in the same manner,
except that it contains no mark to the left of Van Win-
kle's name. Finding of fact number eight is as follows :
"On a ballot of those cast in West Albany Precinct at said
election, a line was drawn, in indelible pencil, through
the name 'E. E. Lange of Linn County, Regular People's,'
and another line immediately beneath the words 'J. J.
Marks of Linn County, Prohibition,' and in the space
between the words 'J. S. Van Winkle of Linn County'

34 OR.—31.

and the word 'Republican' appeared written, in indelible pencil, the word 'voted;' there being no other marks or designations on said ballot for the office of county clerk." These three ballots contain a distinguishing mark by which they might be identified, and, such being the case, they ought not to have been counted for plaintiff. Finding number nine is to the effect that on a ballot cast in West Albany Precinct a pencil line was drawn through the name of each candidate for the office of county clerk, but, in the space below said names, the name of "J. S. Van Winkle" was written. Finding of fact number thirteen is as follows : "On a ballot of those cast at said election in North Brownsville Precinct, there appeared a line, made by indelible pencil, drawn through the name of each Republican candidate on said ticket and the name of the county printed therewith, including the words 'J. S. Van Winkle of Linn County;' there being no other mark of any kind on said ballot for the office of county clerk." The ballots described in findings of fact numbered nine and thirteen are not marked in the manner prescribed by law, and, such being the case, they ought not to have been counted for plaintiff.

These conclusions do not change the result reached by the trial court, in view of which the judgment is affirmed.

AFFIRMED.

ON MOTION FOR REHEARING.

MR. JUSTICE BEAN delivered the opinion.

This cause was tried without the intervention of a jury. A recount was made of all the ballots cast for the office in question, and the court, having made findings of fact upon all the disputed ballots, decided that the defendant was elected by one vote, and entered judg-

ment accordingly.   The plaintiff and contestant ap-
pealed, assigning as error sundry rulings and conclusions
of the court against him.   Upon the hearing of the
appeal it was determined that none of such assignments
were well taken, except the one based upon the action
of the court in counting for the defendant the ballot
described in finding number 26, and marked with the
letters "O K."   This conclusion would necessarily leave
the vote a tie, were it not for the fact that it affirmatively
appears from the findings of the court and its conclusions
of law that it also illegally counted at least two ballots
for the contestant.   Among the unquestioned findings
are numbers 6 and 7, to the effect that certain ballots,
with the words "voted for" written with an indelible
pencil on the face thereof, were counted for the plaintiff
and contestant, and, within the rule which renders the
"O K" ballot void, should not have been counted ;  so
that, notwithstanding the court erroneously counted the
"O K" ballot for the defendant, he still received a greater
number of legal votes than the plaintiff.   It is true, the
defendant did not appeal ;  but he had no occasion or
right to do so, because the judgment was in his favor.
But, nevertheless, we cannot reverse the judgment upon
this record, which shows upon its face that certain ballots
were improperly counted for the plaintiff, and that by
excluding them the judgment is correct, although it
may have been based upon a wrong reason.   The condi-
tion is that there were three ballots cast, each of which
had upon the face thereof such a distinguishing mark as
to render it void under the statute ;  but they were all
counted by the court below,—two for the plaintiff, and
one for the defendant.   The plaintiff insists that the
judgment should be reversed because one of them was
counted for the defendant, notwithstanding the fact that
the other two were counted for himself.   It is claimed,

however, that the ballots referred to in findings numbered 6 and 7 are not in the record, and that no question is made as to their competency or admissibility in evidence. This may be true, but we are not dealing with the ballots, but with the ultimate facts as found by the court; and the question for our determination is whether, upon such facts, the judgment should be affirmed or reversed. And, as it appears that there were cast for the defendant more legal votes for the office of county clerk than were cast for the plaintiff, the judgment of the court below is manifestly right, and ought to be affirmed. While the defendant could not claim any advantage from the ruling of the court against him for the purpose of obtaining in this court a more favorable judgment than he obtained in the court below, yet he is entitled to the benefit of any error made by such court in counting ballots for the plaintiff, for the purpose of upholding and sustaining the judgment from which the appeal is taken.

The other questions referred to in the petition for rehearing were all carefully considered, and are disposed of in the former opinion, and we do not deem it necessary to go over them again.

REHEARING DENIED.

---

Argued 13 February; decided 27 March, 1899.

## AMBROSE *v.* HUNTINGTON.

[56 Pac. 513.]

1. SUFFICIENCY AND EFFECT OF ADVERSE POSSESSION.—Enclosing a tract of land and continually using it under color of title and claim of right constitute such an adverse possession as will start the statute of limitations, and, if continuous for the required time, will confer title, at least as between individuals: *Joy* v. *Stump*, 14 Or. 361, cited.

2. PUBLIC LANDS—RATIFICATION OF AGENT'S ACT.— County school superintendents are not the agents of the state to execute deeds to its school lands, but the state ratifies and becomes bound by their contracts to convey such lands when it accepts and retains the purchase price.

3. STATUTE OF LIMITATIONS—ADVERSE POSSESSION—BOND FOR DEED.—Where a vendee has gone into possession of land under a contract to purchase, his holding is adverse to the vendor from the time he complies with his part of the agreement, and the same rule applies to the state as to a natural person: Hill's Ann. Laws, § 13, and *Anderson* v. *McCormick*, 18 Or. 301, cited.

4. IDEM.—A deed to land as to which an adverse possession against the grantor has ripened into title is ineffectual for any purpose.

5. REAL PROPERTY—EFFECT OF NOTICE BY OCCUPATION.—The open, notorious and exclusive possession and occupancy of real property by a stranger to the title puts a purchaser from a third person upon notice and inquiry concerning the rights and equities of the party in possession, and charges him with all the knowledge that he might have obtained upon reasonable inquiry: *Exon* v. *Dancke*, 24 Or. 110, followed.

From Douglas :    J. C. FULLERTON, Judge.

Suit by A. T. Ambrose against Benjamin Huntington to quiet title to certain lands.    Plaintiff appeals from a decree against him.

REVERSED.

For appellant there was a brief and an oral argument by *Messrs. Wm. R. Willis* and *Andrew M. Crawford.*

For respondent there was a brief over the name of *J. W. Hamilton,* with an oral argument by *Mr. Frank W. Benson.*

MR. CHIEF JUSTICE WOLVERTON delivered the opinion.

This is a a suit to quiet title to the west ½ of the southwest ¼ of section 16, township 23 south, range 5 west, in Douglas County, Oregon.    After denying the material allegations of the complaint, which are in the usual form, the defendant alleges ownership and possession of the premises, and sets up his muniments of title thereto— in effect, that the State of Oregon conveyed the same to Joseph Durbin on March 15, 1892, and he to the defendant on May 20, 1895.    He further alleges that at the time of his purchase from Durbin he had no notice or know-

ledge as to plaintiff's claim of title, and was, therefore, an innocent purchaser for value. The decree of the court below was for defendant, and plaintiff appeals.

It is shown by the testimony that on February 8, 1866, E. A. Lathrop, County School Superintendent of Douglas County, Oregon, sold the land in question to plaintiff for the consideration of $160, of which he paid one-fourth down, and executed and delivered to that officer his three promissory notes, for $40 each, for the balance of the purchase price, payable in one, two, and three years after date, with interest at ten per cent. per annum, payable semi-annually. The two notes payable latest in time were written upon one sheet of paper, and indorsed as follows : "June 17, 1867. Received payment in full on within notes. Andrew Jones, County Treasurer." These notes were given in evidence by the plaintiff, who says he believes he paid the other note, but does not remember distinctly. He further testifies, in substance, that he procured a bond for a deed to the land, and sent the same, with some deeds which had been executed and delivered to him by the county school superintendent of said county, to a party in Salem by the name of John Godell, for the purpose of obtaining a confirmatory deed from the state for the lands described therein ; that he soon after received a deed from the state, bearing date March 22, 1881, which he had recorded September 18, 1883, but the premises conveyed thereby are described as "the northeast quarter of southwest quarter, the northwest quarter of southeast quarter, and lots four, five, six, eight, and nine, of said section sixteen," and, of course, do not include the land in dispute ; that he did not become fully aware of the error until defendant began to claim the land ; and that he never believed the deed from the state described all the land purchased by him.

It is further shown that the plaintiff went into posses-

sion in 1866 ; that he inclosed the land in dispute, with
his other lands, in 1868 ; and that he has maintained
the inclosure ever since, with some few intermissions,
when portions of the fencing broke down through decay
or were destroyed by fire. The evidence upon the sub-
ject is somewhat voluminous and not a little conflicting ;
but it sufficiently appears therefrom that the land in
question lies in a mountainous region, fit only for pas-
turage ; that the plaintiff entirely inclosed it in 1868,
with other lands of his, by a substantial fence consisting
of rails, logs, and brush, and, it may be, at some parts it
was joined to natural obstructions ordinarily sufficient
to turn stock ; and that, considered as a whole, the
fencing was of the nature usually employed in districts
of that character. At some points it was constructed
somewhat off the line, and included some three acres of
railroad land, and five or six acres of land belonging to
Mr. Long. This fact, however, is not material, as the
other land inclosed was inconsiderable, and the fencing
may be said to have been placed substantially upon
boundary lines, except where it was built entirely upon
and through plaintiff's land. Plaintiff thereafter used
and employed the land thus inclosed for pasturing his
sheep and other stock, and has had it in possession and
use for that purpose ever since. The fencing may have
been maintained indifferently at periods, but the plain-
tiff has renewed it from time to time, and practically
kept it in such a condition as to form a substantial in-
closure, up to the time that defendant asserted title
thereto ; and during all the while plaintiff claimed the
entire ownership and title to the land, and so occupied
it, in exclusion of all others. The defendant, to prove
his title, introduced a deed from the State of Oregon to
Joseph Durbin, bearing date March 15, 1892, and one
from Durbin to himself, of date May 20, 1895. Further

than this, it is shown, practically, that plaintiff paid the taxes upon the land until 1892, and thereafter defendant paid them.

Several questions of legal import are presented by the record. It is insisted that plaintiff was not in possession at the commencement of the suit, and, of course, if such was the case, he could not maintain it ; but, in our view, the testimony is quite sufficient to establish actual possession on his part at the time. The defendant claims to have been in possession, but the only act shown which would indicate it is that he went upon the land a short time before suit was begun, and posted notices thereon warning people to keep off the same, and notifying them that he was the owner of the property. Otherwise, he had neither actual nor constructive possession.

1.   Another contention is that plaintiff's possession was not of such a nature as to render it adverse. We think otherwise. It was, from its inception, actual and under color of title. The maintenance of a substantial inclosure, and the continued use and occupation of the land for pasturage of stock (the only purpose for which it was adapted), under claim of right and title, constituted such a visible, open, notorious, distinct, exclusive, and hostile possession as to set the statute of limitations running, and, if continuous during the full period contemplated by the statute, would operate to confer title, at least as between individuals, where the state is not concerned : *Joy* v. *Stump*, 14 Or. 361 (12 Pac. 929) ; *Worthley* v. *Burbanks*, 146 Ind. 534 (45 N. E. 779).

2.   It may be observed, in passing, that the county school superintendent was not the agent of the state, with power to execute a deed to its school lands ; but, as he had contracted to convey the same, and the state had received, accepted, and retained the purchase price, it thereby became bound to the observance of his con-

tracts regarding the land, as it operated as a ratification of his acts in the premises (Mechem, Agency, §§ 148, 149), so that there was substantially a contract on the part of the state with plaintiff to convey to him the premises in dispute.

3.  But the question of vital importance is whether the statute of limitations began to run in favor of plaintiff and against the state at any time while it held and retained the legal title.   The testimony is a little meager touching the bond and its terms relative to the time when the plaintiff became entitled to his deed; but it may be inferred that he became entitled thereto at the time when the purchase price was fully paid, or, at any rate, at the time he sent the bond to Salem for the purpose of obtaining a confirmatory deed.   It may be said that its obligation to make this conveyance became matured and fixed, by full performance on plaintiff's part, not later than March 22, 1881, which was the date of his deed from the state containing the wrong description. It is a rule of law, now uncontroverted, that where the vendee, under a contract or agreement to purchase land, has executed or performed the agreement on his part by full payment of the purchase money, his possession from that time becomes adverse to that of the vendor, having gone into possession primarily under the agreement : *Anderson* v. *McCormick*, 18 Or. 301 (22 Pac. 1062);  2 Wood, Lim. § 260;   *Ridgeway* v. *Holliday*, 59 Mo. 444; *School District* v. *Blakeslee*, 13 Conn. 227;   *Catlin* v. *Decker*, 38 Conn. 262.   There was here, then, a subsisting and binding contract on the part of the state to convey to the plaintiff the land in dispute;  and it would seem that, if it had brought an action to recover possession, the contract would have been a complete defense on the part of Mr. Ambrose.   Such being the case, there was such a possession and claim of title as set the statute

of limitations running against the state: Hill's Ann. Laws, § 13; *Richards* v. *Griffith*, 1 Kan. App. 518 (41 Pac. 196).

4: The continuous maintenance of such adverse possession under claim of title from 1881 until the time suit was instituted (a period of time much longer than ten years), in view of the contractual relations alluded to, operated to invest the plaintiff with a perfect title, even prior to the execution and delivery of the deed by the state to Durbin; and the latter, therefore, acquired no title to the land in dispute by virtue of such deed.

5. Touching the question of good faith, it is settled that an open, notorious, and exclusive possession and occupancy of real property by a stranger to the title is sufficient to put a purchaser from another upon notice and inquiry concerning the rights and equities of the party in possession, and will charge him with all the knowledge that he might have obtained upon reasonable inquiry: *Petrain* v. *Kiernan*, 23 Or. 455 (32 Pac. 158); *Bohlman* v. *Coffin*, 4 Or. 313; *Exon* v. *Dancke*, 24 Or. 110 (32 Pac. 1045).

We are impelled, therefore, under the facts pertaining to this controversy, to impute to the defendant full notice and knowledge of the plaintiff's right and title to the land at the time he purchased of Durbin, and hence conclude that he could not have been an innocent purchaser for value. He was fully aware of the plaintiff's possession, and of his claim of right and title to the premises long prior to the time he obtained the deed from Mr. Durbin. This is manifested from the fact that some eight years prior to the commencement of this suit he was employed and paid by the plaintiff for his services in building a fence along the west boundary line of the land in dispute and upon the line between it and the lands now owned by him. He has lived in the neighbor-

hood for a number of years, and was fully cognizant of plaintiff's claim of ownership of the premises. It seems to have been common reputation among persons living in the neighborhood that plaintiff was the owner and in full and complete possession of the land for many years. In pursuance of these considerations, the decree of the court will be reversed, and one here entered in accordance with the prayer of the complaint.

REVERSED.

Argued 29 March; decided 10 April, 1899.

**BOTEFUHR *v.* ROMETSCH.**

[56 Pac. 803.]

COMPETENCY OF EVIDENCE—AGENCY.—In an action to recover for goods sold, on an issue as to whether defendant purchased for himself, or as the agent of his wife, evidence that the business for which the goods were purchased was owned and conducted by him in the name of his wife was competent, though tending to show that he carried it on in her name for the purpose of defrauding his creditors: *Siglin* v. *Coos Bay R. R. Co.*, 26 Or. 387, distinguished.

From Multnomah:   ALFRED F. SEARS JR., Judge.

This is an acton by Frank Botefuhr to recover $80.45 for goods, wares, and merchandise alleged to have been sold and delivered to John Rometsch at his special instance and request. The complaint is in the usual form in such actions. The answer denies the material allegations of the complaint, and for further and separate defense alleges that, at the time of the purchase of the goods referred to in the complaint, the defendant, as the plaintiff well knew, was the agent and employee of one Kate Rometsch, and that as such agent he bought the goods for her, and not for himself. A reply having put in issue the allegations of the answer, a trial was had, resulting in a verdict and judgment in favor of the plaintiff, and defendant appeals.

AFFIRMED.

For appellant there was a brief over the names of *Edward Mendenhall* and *Raphael Citron*, with an oral argument by *Mr. Mendenhall.*

For respondent there was a brief over the names of *William M. Davis* and *Ralph Platt.*

Mr. Justice Bean, after stating the facts, delivered the opinion of the court.

Upon the trial the defendant gave evidence tending to sustain the allegations of his answer, and to show that the goods in question were purchased by him as the agent of his wife, for use in a saloon owned and conducted by her. The plaintiff thereupon, in rebuttal, called one Liebe, who was permitted, over defendant's objection, to testify in substance, that the defendant was in fact the owner of the saloon referred to, and that his wife's name was used by him in conducting the business to enable him to defraud his creditors. At the proper time the defendant requested an instruction that the question of fraud was not involved in the case, and should not be considered by the jury, which the court refused to give, but, on the contrary, instructed that: "In a transaction of that kind, you have the right to examine the various aspects for the purpose of determining what was the actual relation between the parties. If the object was to defraud, or to commit a fraud upon the creditors of the defendant, and if the business was carried on in his wife's name as a mere cover for the purpose of carrying out that object, then, of course, it could not avail; it could not be upheld." The giving of this instruction, the refusal to instruct as requested, and the admission of Liebe's testimony, the defendant contends, were error; because not within the issues made by the pleadings;

and he invokes the rule announced in *Coos Bay R. R. Co.* v. *Siglin,* 26 Or. 387, 392 (38 Pac. 192), in support of his contention.    But we do not understand that it has any bearing whatever on the case at bar.    In that case it was sought to impeach the title of a purchaser of personal property on the ground that the purchase was made for the purpose of aiding the seller in defrauding his creditors, without setting up such fact in the pleadings.    But in this case the question was whether the saloon business, for which the goods alleged in the complaint were purchased by the defendant, was owned and conducted by him or Kate Rometsch ;   and any evidence bearing upon that question was competent, although it may have tended to show that the defendant's object was to cover up his property for the purpose of defrauding his creditors.    No title to property is involved in this case, nor is it a proceeding to uncover property concealed from creditors.    It is simply an action to recover for goods sold and delivered, and the only question was whether the defendant purchased such goods for himself, or as the agent of his wife.    Any evidence bearing upon that question was competent and proper to be submitted to the jury.    The judgment is affirmed.

AFFIRMED.

Argued 31 January, 1899; decided 27 March, 1899.

### MALARKEY *v.* O'LEARY.

[56 Pac. 521.]

1. JURISDICTION OF JUSTICES OF THE PEACE—REAL PROPERTY ACTIONS.— Under Hill's Ann. Laws, § 909, subd. 1, providing that the jurisdiction of a justice's court shall not extend to an action in which the title to real property is in question, and section 2081, which provides that if it appear, "from the evidence of either party, that the title to lands is in question, which title shall be disputed by the other party," the case shall be certified to the circuit court, the justice does not lose jurisdiction of an action over which he otherwise has jurisdiction because the pleadings make an issue of title to realty. That result is accomplished only when it appears on the trial from the evidence that the title to land is actually contested: *Sweek* v. *Galbreath,* 11 Or. 516, cited.

2. PENALTY FOR FAILURE TO DISCHARGE MORTGAGE.—It is no defense in an action for a penalty under Hill's Ann. Laws, § 3034, for refusal or neglect to discharge a mortgage, that the mortgagor is indebted to the mortgagee outside of the mortgage debt.

3. IDEM.—Attorney's fees incurred in the preparation for foreclosure proceedings are not "reasonable charges" within Hill's Ann. Laws, § 3034, prescribing a penalty for the neglect or refusal of a mortgagee upon request to discharge a mortgage after performance of the condition and tender of his "reasonable charges;" by that term the statute contemplates only such charges as may reasonably be incurred in the matter of the discharge of the mortgage.

4. IDEM.—The fact that a mortgagee acted in good faith in refusing to discharge a mortgage after payment, under the honest belief that he need not do so until.payment of expenses incurred in preparation for foreclosure proceedings, does not relieve him from liability for the penalty provided by Hill's Ann. Laws, § 3034.

From Multnomah :    ALFRED F. SEARS JR., Judge.

This action was brought in a justice's court by James A. Malarkey against Charles M. O'Leary to recover the penalty provided in Section 3034, Hill's Ann. Laws, for the refusal of a mortgagee to discharge a mortgage. The complaint avers, in substance, that on February 8, 1895, one William C. Holman, who was the owner of certain real estate in Portland, mortgaged the same to the defendant to secure the payment of a promissory note for the sum of $200, due ninety days after date ; that on October 16, 1895, Holman, by warranty deed, transferred and conveyed the mortgaged property to plaintiff, who ever since has been, and now is, the owner thereof ; that, contemporaneous with such conveyance, and as a part of the same transaction, the plaintiff paid to the defendant the amount due on the note referred to, and it was canceled and delivered up to him, and all the conditions of the mortgage fully performed and complied with ; that on the twenty-fifth of March, 1896, the plaintiff requested the defendant to discharge the mortgage, or execute and acknowledge a release thereof, offering to pay all costs and charges therefor, but the defendant refused to comply with such request.    A demurrer for want of juris-

diction having been overruled, the defendant answered, admitting the execution and delivery of the note and mortgage as alleged in the complaint, the subsequent payment and satisfaction of the note, and compliance with the terms and conditions of the mortgage, but denying upon information and belief the alleged title of Holman and the plaintiff to the mortgaged premises, and for a further and separate defense alleged that at their maturity the defendant placed the note and mortgage in the hands of his attorneys for foreclosure ; that, in making preparation for that purpose, they performed work and services of the reasonable value of $10, which Holman agreed to pay if defendant would postpone foreclosure proceedings for a time ; that, relying upon this promise and agreement, the defendant refrained from instituting such proceedings, but Holman has not paid said sum, or any part thereof, and it is still due and owing to the defendant.   The plaintiff demurred to the new matter in the answer, on the ground that it did not state facts sufficient to constitute a defense to the cause of action set forth in the complaint, and at the same time moved to strike out certain denials.   The motion was overruled, and the demurrer sustained.   Thereafter the cause was tried by the justice, and a judgment rendered in favor of the plaintiff for the amount demanded, besides costs and disbursements.   From this judgment the defendant appealed to the circuit court, where the ruling of the justice court upon the motion and demurrer was sustained. Upon the trial in the latter court, the defendant objected to the admission of any evidence tending to show that the plaintiff had purchased or acquired the title to the mortgaged premises, on the ground that the question of title to real property was involved, and therefore the justice's court had no jurisdiction.   This objection was overruled, and defendant excepted.   The trial thereafter

proceeded, resulting in a judgment againt the defendant, from which he appeals to this court, and insists that neither the justice's nor the circuit court had jurisdiction of the case, for the reason that the title to real property was in issue, and that the court erred in sustaining the demurrer to the separate defense set up in the defendant's answer.

AFFIRMED.

For appellant there was a brief over the names of *O'Neil & Thompson*, and *C. H. Meusdorffer Jr.*, with an oral argument by *Mr. Mark O'Neil.*

For respondent there was a brief and an oral argument by *Messrs. Schuyler C. Spencer* and *Daniel J. Malarkey.*

MR. JUSTICE BEAN, after stating the facts, delivered the opinion of the court.

1.   The claim of want of jurisdiction is founded on subdivision 1 of section 909 of the statute (Hill's Ann. Laws), which provides that the jurisdiction of a justice's court shall not extend "to an action in which the title to real property shall come in question;" and the contention is that when, in an action in such court, the title to real property is put in issue by the pleadings, the justice is necessarily ousted of jurisdiction, and a judgment thereafter rendered is void, and that jurisdiction cannot be acquired by an appellate court upon an appeal therefrom, but we are unable to concur in this position.   Section 2081, Hill's Ann. Laws, furnishes the rule by which it shall be determined when the title to real property "comes in question" in a civil action in a justice's court, and points out the method of procedure in such case, by providing that "if it appear on the trial of any cause before a justice of the peace, from the evidence of either

party, that the title to lands is in question, which title shall be disputed by the other party, the justice shall immediately make an entry thereof in his docket and cease all further proceedings in the cause, and shall certify and return to the circuit court of the county a transcript of all the entries made in his docket relating to the case, together with all the process and other papers relating to the action, in the same manner and within the same time as upon an appeal; and thereupon the circuit court shall proceed in the cause to final judgment and execution in the same manner as if the said action had been originally commenced therein, and costs shall abide the event of the suit.'' It is obvious that the several provisions of the statute concerning the jurisdiction of a justice's court were enacted with the common purpose of prohibiting such courts from trying actions in which the title to real property is in fact in question; but a mere issue of title made by the pleadings is not of itself sufficient, under the statute, to oust the court of jurisdiction. It must appear, from the evidence as offered or given on the trial, that the title to land is in fact in question, and is disputed by the other party. An issue of title may be made by the answer, and afterwards waived, and no evidence offered or given upon the subject whatever. In such case the question of title could not in any sense come in issue, or be determined by the justice. Under the statute a justice not only has the right, but it is his duty, to enter upon the trial of a cause over which he otherwise has jurisdiction, notwithstanding an issue of title made by the pleadings, and, unless it appears at the trial, from the evidence, that the title to land is actually in dispute, to proceed and try the case out and render judgment.

This is the construction given to similar statutes by

34 OR.—32.

the courts of other states, and is manifestly the object and purpose of the act of 1885 : *Sweek* v. *Galbreath*, 11 Or. 516 (6 Pac. 220). The Constitution of the State of Minnesota provides that "no justice of the peace shall have jurisdiction in any case involving the title to real estate," and it was held in *Goenen* v. *Schroeder*, 8 Minn. 387, under a statute almost identical in language with our section 2081, that, even when the issue tendered by the answer in an action in a justice's court is one of title, an appellate court could not say the justice acted beyond his jurisdiction, unless it was shown from the record that the title came in question on the evidence at the trial. In *Delzell* v. *Railway Co.*, 89 Iowa, 208 (56 N. W. 433), under a statute providing that, if the title to real property be put in issue by the pleading, supported by affidavit, the justice shall certify the case up to the circuit court, it was held that an answer putting title in issue, if not supported by affidavit, would not oust the justice of jurisdiction, notwithstanding a constitutional provision that a justice's court should not have jurisdiction where title to real property came in question. To the same general effect are *Melloh* v. *Demott*, 79 Ind. 502 ; *Maxam* v. *Wood*, 4 Blackf. 297 ; *Rogers* v. *Perdue*, 7 Blackf. 302 ; *State* v. *Cotton*, 29 Minn. 187 (12 N. W. 529); *Radley* v. *O'Leary*, 36 Minn. 173 (30 N. W. 457). It follows from this rule, that before it can be held that a justice's court was without jurisdiction, upon the grounds suggested, it must be shown that it appeared on the trial in such court, from the evidence, that the title to land was in question. The record does not show that any such evidence was offered or given, or that the title came in question in the justice's court, or that any objection was made to proceeding with the cause on that account. We are of the opinion, therefore, that the circuit court

did not err in ruling and holding that the justice's court had jurisdiction to render the judgment from which the appeal was taken.

2.    The remaining question is whether the new matter set up in the answer constituted a defense.   The statute under which the action was brought reads as follows : "If any mortgagee, or his personal representative or assignee, as the case may be, after full performance of the conditions of the mortgage, whether before or after a breach thereof, shall for the space of ten days after being thereto requested, and after tender of his reasonable charges, refuse or neglect to discharge the same as provided in this title, or to execute and acknowledge a certificate of discharge or release thereof, he shall be liable to the mortgagor, his heirs or assigns, in the sum of $100 damages, and also for all actual damages occasioned by such neglect or refusal, to be recovered in an action at law :"   Hill's Ann. Laws, § 3034.   Under this section a mortgagor, his personal representative, or assignee, is entitled to have the mortgage satisfied within the time specified, after full performance of its conditions and tender of his reasonable charges.   The complaint alleges payment of the mortgage debt,. cancellation and surrender of the note, and performance of the conditions of the mortgage.   None of these allegations are denied by the answer.   Nor is it claimed that the payment of the amount referred to therein is a condition of the mortgage or secured by it.   The conditions of the mortgage having been admittedly performed, the mortgagor or his assigns had a right to its discharge of record, and the purpose of the statute is to quicken the diligence of a mortgagee in this regard.   An unsatisfied mortgage of record is constructive notice of the existence of a debt, and necessarily tends to injuriously affect the pecuniary standing and credit of the mortgagor.   When it is paid,

the statute has provided for its satisfaction on the record, so that the fact of payment may be known to the world. The reasonableness of the requirement is apparent. To insure its observance, the mortgagee is required to acknowledge the satisfaction of a mortgage, when paid, in as public a manner as the mortgagor had acknowledged its existence, or suffer the statutory penalty. And it is no defense that the mortgagor may be otherwise indebted to the mortgagee.

3. It is also claimed by the defendant that the "reasonable charges" contemplated by the statute would include attorney's fees incurred in the preparation for foreclosure proceedings ; but the statute manifestly contemplates only such charges as may reasonably be incurred in the matter of the discharge of the mortgage : *Collar* v. *Harrison*, 30 Mich. 66.

4. He also claims that the answer is sufficient, because it shows that the defendant was acting in good faith and under an honest belief that he was not required to satisfy the mortgage until the payment of the sum mentioned in the answer. But his good faith is no defense. Although the statute is penal in its character, the good faith of the mortgagee in refusing to cancel a mortgage of record will constitute no defense to an action brought to recover the penalty provided for in the statute, after the terms and conditions of the mortgage have admittedly been complied with : *Boyes* v. *Summers*, 46 Neb. 308 (64 N. W. 1066) ; *Shields* v. *Klopf*, 70 Wis. 69 (35 N. W. 284) . Where there is an honest dispute between the mortgagor and mortgagee as to the amount due on the mortgage, or as to whether its terms and conditions have been fully complied with, it may be that a court would refuse to enforce the penalty, if it should appear that the mortgagee was acting in good faith in refusing to satisfy the mortgage, although its terms and condi-

tions had in fact been fully complied with : *Canfield* v. *Conkling*, 41 Mich. 371 (2 N. W. 191). But no such question is involved in this case, because the pleadings admit, and it is conceded throughout, that the mortgage debt had been paid, and the terms and conditions of the mortgage complied with, and that the defendant refused and neglected to discharge the mortgage for the space of more than ten days after he had been requested to do so. We conclude that the new matter in the answer constituted no defense to the action, and that the court committed no error in sustaining the demurrer thereto. It follows that the judgment of the court below must be affirmed, and it is so ordered.

AFFIRMED.

Decided 10 April, 1899.

## BURRELL *v.* KERN.

[56 Pac. 809.]

EXECUTORS—RIGHT OF ACTION.—Executors may sue either individually or in their representative capacity, at their option, on causes of action, whether in contract or in tort, accruing after the death of the intestate or testator; hence, in such cases, the complaint need not show for whose estate they are executors.

From Multnomah :   JOHN B. CLELAND, Judge.

This is a suit to foreclose a mortgage. The plaintiffs are styled, in the caption or title of the complaint, "Walter F. Burrell and D. P. Thompson, Executors," and it is alleged, among other things, that at all the times stated in the complaint plaintiffs were, and now are, the duly appointed, legally qualified, and acting executors of the last will and testament of M. S. Burrell, deceased, and that defendants made, executed, and delivered to plaintiffs their certain promissory note, a

copy of which is set out, showing that it was made to "W. F. Burrell and D. P. Thompson, Executors." It is further alleged that, for the purpose of securing the payment thereof, defendants duly made, executed, and delivered to plaintiffs their certain mortgage ; and in all other respects the complaint is in the usual form. The defendants filed a motion to require plaintiffs to make the complaint more definite and certain, so as to show the name of the deceased person for whose estate the plaintiffs sue as the alleged executors.. This was overruled, and thereupon a general demurrer was interposed, assigning as ground therefor that the complaint does not state facts sufficient to constitute a cause of suit, which was also overruled, and, defendants refusing to plead further, a decree as prayed for was entered, from which they appeal.

AFFIRMED.

For appellants there was a brief over the names of *William Wallace Thayer* and *Henry St. Rayner*.

For respondents there was a brief over the name of *Dolph, Mallory & Simon*.

MR. CHIEF JUSTICE WOLVERTON, after stating the facts, delivered the opinion of the court.

It seems to be the theory of the defendants that suit was brought by the plaintiffs in their representative capacity as executors ; hence the interposition of both the motion and demurrer. But the complaint shows, when the documents upon which it is based, the averments touching them, and its whole scope, are considered, that plaintiffs have sued in their individual, and not their representative, capacity : *Beers* v. *Shannon*, 73 N. Y. 292. The prevailing rule seems to be, with possibly some few

exceptions, that when the cause of suit or action, whether in contract or in tort, accrues after the death of the testator or intestate, the money, if recovered, will be assets of the estate, and the executor or administrator may sue, at his option, in either his representative or individual capacity: 8 Enc. Pl. & Prac. 658; *Haskell* v. *Bowen*, 44 Vt. 579; *Grimmell* v. *Warner*, 21 Iowa, 11; *Mowry* v. *Adams*, 14 Mass. 327; *Kane* v. *Paul*, 39 U. S. (14 Pet.) 33; Bliss, Code Pl. (3 ed.), § 53. The use of the word "executors," in the title of the case and in the note, is a mere *descriptio personæ*, and does not of itself operate to attach to plaintiffs a representative character (*Beers* v. *Shannon*, 73 N. Y. 292; 2 Am. & Eng. Enc. Law, [1 ed.] 334), and may be regarded as surplusage (*Miller* v. *Kingsbury*, 128 Ill. 45, 21 N. E. 209). As the note and mortgage in question were made, executed, and delivered to the plaintiffs, and not to their testator, they were authorized, under the rule, to sue in either their representative or individual capacity; and it is very apparent that the complaint states a good cause of suit in one or the other capacity, and is amply sufficient as against the test of a general demurrer. Now, it was a matter of no moment to the defendants in what character plaintiffs prosecuted their suit to foreclose, as they could have set up whatever defense they may have in this suit as well as if it had been brought in any other form (*Miller* v. *Kingsbury*, 128 Ill. 45, 21 N. E. 209; and hence there was no error in overruling the motion and demurrer, or in entering the decree appealed from, which will therefore be affirmed.

                                               AFFIRMED.

Decided 3 April, 1899.

## WHEELER v. BURCKHARDT.

[56 Pac. 644.]

1. TAKING DEPOSITION OF ADVERSE PARTY BEFORE TRIAL.—Under Hill's Ann. Laws, § 814, Subd. 1, and Section 823, authorizing the taking of the deposition of an adverse party previous to the trial before an officer authorized to administer oaths, on the giving of a three-days' notice, unless the court prescribes a shorter time, it is not necessary that the officer taking the deposition should be commissioned by the court.

2. PRESUMPTION OF SUFFICIENCY OF FINDINGS.—In an action for a conversion of chattels, the evidence will be presumed to sustain a finding as to their value, in the absence of a bill of exceptions.

From Multnomah:   E. D. SHATTUCK, Judge.

Action in justice's court by James N. Wheeler against F. Otto Burckhardt and others.   From a judgment dismissing the action, plaintiff appealed to the circuit court, which gave judgment for plaintiff, and defendant Burckhardt appeals.

AFFIRMED.

For appellant there was a brief over the names of *Lawrence A. McNary*, *Frank Schlagel*, and *J. P. Kavanaugh*, with an oral argument by *Mr. Schlagel*.

For respondent there was a brief and an oral argument by *Mr. Clinton C. Palmer*.

MR. JUSTICE MOORE delivered the opinion.

This action was originally commenced in the Justice's Court of Portland District, Multnomah County, to recover damages for an alleged unlawful taking and conversion of personal property.   It is averred in the complaint that one C. C. Palmer having duly obtained a judgment in the Justice's Court of East Portland Dis-

trict, in said county, against John W. Moore for the sum
of $17.95, and his disbursements, taxed at $5.40, an exe-
cution was issued thereon, in pursuance of which the
plaintiff, as constable of said last-named district, seized
certain of Moore's personal property to satisfy the writ;
that, while plaintiff was in possession of said property
by virtue of said execution and seizure, the defendants,
F. Otto Burckhardt, Thomas Parker, and John W. Moore,
forcibly took and unlawfully converted the same to their
own use, to his damage in the sum of $23.35, the amount
of the judgment and costs; and that in consequence of
their unlawful acts he had sustained special damage in
the sum of $33.75, for which he prayed judgment. The
defendants having by their answer specifically denied
the allegations of the complaint, plaintiff's counsel on
September 18, 1896, served upon them and their attorney
a notice to the effect that on the twenty-first of that
month, at the hour of 2 o'clock in the afternoon, he would
take the deposition of Burckhardt, as a witness in said
action, before Ernest E. Merges, a Notary Public for Ore-
gon, at Room 520 in the Chamber of Commerce Build-
ing, in the City of Portland, and at the same time served
a subpœna, issued by Merges as notary public, upon
Burckhardt, requiring him to appear as a witness in said
action at the time and place specified in the notice. In
pursuance of the service of the subpœna, Burckhardt
appeared at the time and place designated, returned the
witness fees received by him, and refused to be sworn as
a witness. When the action was called for trial, plain-
tiff's counsel moved the court to strike Burckhardt's
answer from the files, on the ground of his refusal to be
sworn as a witness, or to give his deposition before the
notary public, but, the motion being overruled, plaintiff
refused to offer any evidence, whereupon the action was
dismissed, and he appealed to the circuit court, which

court struck said answer from the files, found that defendant Burckhardt was in default, that the property so converted was of the value of $30, and gave judgment accordingly, from which Burckhardt appeals.

1.   It is contended by defendant's counsel that, inasmuch as Merges had not been commissioned by the justice of the peace to take the deposition of any witness in said action, he was powerless to issue a subpœna, and could not, on the mere notice of plaintiff's attorney, compel Burckhardt to testify in an action pending in said court, and hence the circuit court erred in striking his answer from the files, and in rendering judgment against him.   The statute (Hill's Ann. Laws, § 814, Subd. 1), so far as applicable to the case at bar, in designating the person whose deposition may be taken, reads as follows : "The testimony of a witness in this state may be taken by deposition, in an action at law, at any time after the service of the summons, or the appearance of the defendant ; and in a special proceeding after a question of fact has arisen therein, in the following cases : (1) When the witness is a party to the action or proceeding by the adverse party."   In *Roberts* v. *Parrish*, 17 Or. 583 (22 Pac. 136), Mr. Justice STRAHAN, in construing this section, and speaking of the right of a party to an action to compel another party thereto to give his deposition, says :   "The proper construction of this provision of the Code does not seem to be free from difficulty, but I am inclined to the opinion that subdivision 1 of section 814 grants a right to either party to compel his adversary to give his deposition.   This right has no existence independent of this statute, and its sole purpose was to declare and secure that right.   It was this and some other similar provisions in the Code that have rendered bills of discovery obsolete, or at least that were designed to take their place, and to extend the field of inquiry

from suits in equity to actions at law." At the common law depositions *de bene esse* could not be read in evidence without the consent of the adversary party; and statutes conferring the right of procuring and preserving the testimony of a witness in this manner, and removing the objections of a party to their being read at a trial, being in derogation of the ancient rule, are to be strictly construed: 9. Am. & Eng. Enc. Law (2 ed.), 300; *Ragan v. Cargill*, 24 Miss. 540.

Either party may take the testimony of a witness in this state by deposition in an action at law after the service of the summons or the appearance of the defendant, before any person authorized to administer oaths, on giving the adverse party notice of the time and place of examination, the name of the officer and the witness. Such notice shall be at least three days, unless the court or judge by order prescribe a shorter time: Hill's Ann. Laws, § 823. A notary public is a person who is authorized to administer oaths: Id. § 2325. The subpœna was issued in pursuance of the authority conferred by Subd. 3 of Section 790, Hill's Ann. Laws, and duly served by a person over eighteen years of age: Id. § 792. Burckhardt was, therefore, obliged to obey the command of the writ directed to him, and requiring his attendance as a witness in said action on plaintiff's behalf: Id. § 846. "Disobedience to a subpœna, or a refusal to be sworn, or to answer as a witness, or to subscribe an affidavit or deposition when required, may be punished as a contempt by the court or officer before whom he is required to attend or the refusal takes place, and if the witness be a party, his complaint, answer, or reply may be stricken out:" Id. § 797. The transcript shows that there has been a strict compliance with all the statutory provisions necessary to produce Burckhardt's deposition, and for his refusal to testify as a witness the court pos-

sessed plenary power to strike out his answer. As we view the provisions of Hill's Ann. Laws, § 823, it is unnecessary to procure an order from the court or judge to take the testimony of a witness in this state by deposition in an action then pending in such court, unless the exigencies of the case demand that his testimony should be taken in a shorter period than that prescribed by law.

It is argued that if a party, at the instance of his adversary, can be compelled to give his deposition before a person who has not been commissioned by the court in which the action is pending, and in the absence of an affidavit showing the materiality of his testimony, such a method of preparing for the trial would be tantamount to a fishing excursion for evidence to support a doubtful cause. The reasons assigned by defendant's counsel seem cogent, but would be more appropriately addressed to the legislative assembly, in whom the power of regulating the mode of procedure in such matters is lodged by the organic law of the state. If such a rule becomes oppressive, the best method of securing its repeal is by the enforcement of its provisions. As it now stands, each party to an action is afforded an opportunity to ascertain prior to the trial his adversary's views of the matters in issue.

2. It is also insisted that the findings of the court do not support the judgment. Burckhardt's answer having been stricken out, the only remaining issue, under the statute, was the value of the property which had been converted (Hill's Ann. Laws, § 249; *Luse* v. *Isthmus Ry. Co.*, 6 Or. 125; *Fink* v. *Canyon Road Co.*, 5 Or. 302; *Moody* v. *Richards*, 29 Or. 282, 45 Pac. 777); and, since the transcript does not contain any bill of exceptions, it must be presumed that the evidence warranted the finding in this respect, and that such finding is consonant with the judgment, which is affirmed.        AFFIRMED.

Argued 27 February;  decided 30 April, 1899.

## McKINNEY *v.* STATESMAN PUBLISHING CO.

[56 Pac. 651.]

1. CONSTRUCTION OF CONTRACT—HIRING AT WILL.—A contract of employment for a year containing an agreement that "this contract shall be renewed during the strict performance of its conditions," is a contract at will which may be terminated by either party at his pleasure, after the expiration of the stated period:  *Christensen* v. *Pacific Coast Borax Co.*, 26 Or. 302, cited.

2. CONSTRUCTION OF CONTRACT—RENEWAL CLAUSE.—Such a contract, however, imposes on the employer the obligation to renew the contract on the same terms for a second year.

3. CONSTRUCTION OF CONTRACT—"SETTLEMENT."—The word "settlement," as used in a contract requiring a collector to pay in moneys as he collects, and make a complete settlement on certain days, means payment, and not a computation of accounts.

From Marion :   George H. Burnett, Judge.

Action by John W. McKinney against the Statesman Publishing Company.   From a judgment for plaintiff, defendant appeals.

REVERSED.

For appellant there was a brief over the name of *Hayden & McNary*, with an oral argument by *Messrs. Robert J. Hendricks* and *J. H. McNary*.

For respondent there was a brief over the names of *George G. Bingham* and *Holmes & Kellogg*, with an oral argument by *Mr. Bingham*.

Mr. Justice Moore delivered the opinion.

This is an action to recover damages for the alleged breach of a contract.   It is alleged that defendant, being duly incorporated, entered into a contract with plaintiff, of which the following is a copy :  "Agreement entered into between the Statesman Publishing Co., of Salem,

Oregon, and John W. McKinney, of Salem, Oregon. The Statesman Publishing Co. agrees to lease to John W. McKinney, for the term of one year from the date hereof, the route in the City of Salem and its suburbs of the Daily Oregon Statesman newspaper. The said John W. McKinney is to have the exclusive charge of said route for said time for the distribution of papers six days in the week, being each day excepting Monday. He is to collect for said paper fifteen cents per week from each of the present subscribers, or any other persons who may subscribe therefor. For each copy of such paper thus delivered he is to pay us at our office the sum of ten cents per week, and to apply on said account all the moneys he can conveniently collect at the end of each and every week, and to make full and complete settlement of his account for the same on the tenth day of each and every month. He shall have each morning, free, five copies of said paper, a part of which number he shall use each day, as his judgment dictates, as sample copies. When the list shall have reached one thousand, he shall have each morning, free, fifteen copies. He shall be allowed, for the delivery of any papers we may order, five cents per week, and in such cases the papers will not be charged to him. He shall be furnished with the number of papers he orders each morning, folded, at the business office of the paper, in Salem. He shall use his efforts every working day in canvassing to increase the subscription lists of the paper in Salem and suburbs. He shall bear the whole expense of the delivery of and collection for such paper, and at the expiration of this contract by limitation, or through neglect to fulfill its provisions, he shall deliver up to the above company the lists of subscribers, with addresses, so far as he may have them. In the event of the termination of this contract with a balance due us, we shall

be entitled to collect such balance from subscriptions due on such lists, paying over any balance above such amount due us to John W. McKinney, after deducting the reasonable expenses of collection. But the turning over of such lists shall not act as a complete settlement, in case the amount of the indebtedness to us cannot be realized from them. This contract shall be renewed during the strict performance of its provisions. Signed in duplicate this 17th day of May, 1895. Statesman Publishing Co., C. B. Irvine, Mngr. Accepted. J. W. McKinney." It is also alleged that plaintiff performed all the terms of the agreement imposed upon him, notwithstanding which defendant refused to renew the contract, and on May 17, 1896, wrongfully deprived him of said route, to his damage in the sum of $1,500, for which he prayed judgment. A demurrer on the ground that the complaint did not state facts sufficient to constitute a cause of action having been overruled, the defendant filed an answer, denying the material allegations therein, and alleging new matter to which plaintiff replied ; and a trial being had, resulted in a judgment for plaintiff in the sum of $350, from which defendant appeals.

1. It is contended by defendant's counsel that the clause contained in the agreement that "this contract shall be renewed during the strict performance of its provisions," is indefinite as to time, which renders such provision void, and that the uncertainty in this respect being manifest from an inspection of the complaint, the defect was not cured by answering over. In *McCullough Iron Co.* v. *Carpenter*, 67 Md. 554 (11 Atl. 176), it is held that the employment of a person for an indefinite time is a hiring at will, which either party can terminate at pleasure. Mr. Justice Irving, delivering the opinion of the court, says : "There can be no doubt that in this country the rule is, an indefinite hiring is *prima facie* a

hiring at will. It is also well settled that a hiring at so much a week, month, or year, no time being specified, does not of itself make more than an indefinite hiring.'' In *Lord* v. *Goldberg*, 81 Cal. 596 (15 Am. St. Rep. 82, 22 Pac. 1126), plaintiff was engaged to perform certain service for defendants, who gave him a written memorandum to the effect that his employment should be permanent, so long as he desired to make it so, but thereafter, being unwilling to submit to a reduction of the compensation which they agreed to pay, he left their service; and, having brought an action to recover the damage alleged to have been sustained, it was held that the memorandum evidenced an employment for an indefinite time, which meant that the relation should continue until either party, for good reason, wished to sever it. In *Evans* v. *St. Louis, I. M. & S. Ry. Co.*, 24 Mo. App. 114, plaintiff, a locomotive engineer, having been employed by defendant to run one of its engines, for which it agreed to pay him the sum of $115 a month, was discharged within the month; and, having instituted an action to recover the compensation agreed to be paid for that period, it was held that the agreement to pay a stated sum per month did not, in the absence of other evidence, fix the period of hiring at one month, and that the relation of master and servant was determinable, under such circumstances, at the will of either party. In *Orr* v. *Ward*, 73 Ill. 318, plaintiff entered into a written agreement with the defendant, by the terms of which the latter agreed to pay him for his services as a traveling salesman the sum of $2,100 for the year 1873, and $2,400 for the next year, but in June, 1873, the firm of which defendant was a member having become bankrupt, plantiff was discharged, whereupon he brought an action to recover the damage which he claimed to have sustained by reason of the breach of said agreement; and it

was held that, inasmuch as there was no undertaking on the part of the defendant to continue plaintiff in his employment for any definite length of time, the latter had no cause of action against him on account of the discharge.

In *Howard* v. *East Tenn. etc. R. R. Co.*, 91 Ala. 268 (8 South. 868), plaintiff was employed by defendant as its land agent, at a stated salary per month, to perform certain service, under an agreement which contained no stipulation for the continuance of the employment for any definite period, and, having been discharged, he brought an action to recover the damage alleged to have been sustained; but the trial court, having sustained a demurrer to the complaint, rendered judgment against him, in affirming which Mr. Justice Coleman, speaking for the court, says: "The material inquiry is whether the contract as stated is not void for uncertainty, or one which either party could terminate at will. No damages are claimed for services past rendered, but for a refusal to continue plaintiff in his employment, and there is no averment as to the time when plaintiff was dismissed. The law does not favor, but leans against, the destruction of contracts because of uncertainty; but, when contracts are so vague and indefinite in terms that the intention of the parties cannot be fairly and reasonably collected from them, the court will not undertake to give them effect." In *Coffin* v. *Landis*, 46 Pa. St. 426, it was held that where one employs an agent to sell land, under an agreement that the latter shall receive one-half of the net proceeds arising from such sales, and there is no stipulation in the contract as to the duration of the employment, the principal has the right to terminate the relation at any time, and may discharge the agent without notice. As illustrating the principle that employ-

34 Or.—33.

ment at a stated sum per week, month, or year, indefinite as to the term of service, is a hiring at will, which either party may terminate at pleasure, see *Christensen* v. *Borax Co.*, 26 Or. 302 (38 Pac. 127) ; *Haney* v. *Caldwell*, 35 Ark. 156 ; *De Briar* v. *Minturn*, 1 Cal. 450 ; *Perry* v. *Wheeler*, 12 Bush, 541 ; *Beach* v. *Mullin*, 34 N. J. Law, 343 ; *Prentiss* v. *Ledyard*, 28 Wis. 131 ; *Thomas* v. *Hatch*, 53 Wis. 296 (10 N. W. 393).

2.    It is maintained by plaintiff's counsel, however, that the stipulation to renew the contract is analogous to a covenant to renew a lease of real property, and imposed upon defendant the duty of executing a new contract for the term of one year from May 16, 1896, containing all the conditions of the prior agreement, except the stipulation to renew the contract, but that the defendant, having refused to keep its engagements, is liable to their client for the damage which he sustained by reason of such refusal.    In *Iron Factory Co.* v. *Richardson*, 5 N. H. 294, it is held that where a person is hired for a year at a stipulated price, and continues in the same employment afterwards without any new contract, it is to be presumed that both parties intended that the same price is to be continued.    Mr. Chief Justice RICHARDSON, in speaking of the implied agreement under which the subsequent service was performed, says : "It is like the case of a tenant holding over after the expiration of his term, without any new agreement, in which case an implication arises that there is a tacit consent on both sides that the tenant shall hold at the old rent." In *Rutgers* v. *Hunter*, 6 Johns. Ch. 215, it is held that a stipulation contained in a demise of real property whereby the landlord covenanted to "renew the said lease," without specifying the conditions or terms thereof, implied a leasing for the same term as specified in the original lease, with all its conditions, except the cov-

enant to renew.  Mr. Chancellor KENT, speaking of the latter condition, in rendering the decision, says : "If a covenant to renew the lease 'necessarily included a renewal of all the covenants in it, it would be tantamount to a covenant for perpetual renewal, and so extraordinary a covenant ought not to depend on inference merely."  In *Creighton* v. *McKee*, 2 Brewst. 383, Mr. Justice LUDLOW, after announcing the rule by which the intention of the parties is to be ascertained from the inspection of a lease containing a similar provision, says : "Interpreting the clause in the lease before us by the aid of the principles stated, we must come to the conclusion that the word 'This,' in the clause, 'This lease to be renewable at the pleasure of the lessee,' implies, not only the right of renewal, but also upon the terms and for the time specified in the instrument, at the will and pleasure of the lessee, for at least another term."  So, too, in *Cunningham* v. *Pattee*, 99 Mass. 248, Mr. Justice FOSTER, in construing a clause of a lease which contained the following provision, "And the said lessors do promise to renew said indenture for such further term as their leasehold estate in the premises may be renewed or extended,"—says : "The covenant to renew is not void for indefiniteness.  The word, *ex vi termini*, implies the giving of a new lease like the old one, with the same terms and stipulations, at the same rent, and with all the essential covenants."  The method adopted to ascertain the meaning of the word "renew," as used in a lease of real property, where no definite time is prescribed, applies, in our judgment, with equal reason, to the meaning of the word as used in the contract under consideration ; and, this being so, defendant was required thereby to permit plaintiff to continue the service for the term of another year, upon the same conditions as are mentioned

in the agreement, except as to the stipulation to renew, and hence the complaint states facts sufficient to constitute a cause of action.

3.   The court instructed the jury in relation to plaintiff's duties as follows :   "It would be a proper compliance with that condition of the contract, if he turned over at the end of every week all the money he could conveniently collect ; and, in order for them to show a violation of that condition of the contract, it would be necessary to show that he had collected money, and had not turned it over.   No matter how much he might remain in debt to them at the end of the week, or tenth of the month, if he had not collected the money under the contract, it would not constitute a violation of this contract, if he had a settlement on the tenth of each month ; and a 'settlement' means nothing more than to get together and determine upon a balance which is ascertained to be due.   It does not require that he make a payment on the tenth of each month.   He is only required to apply all money on that account that he had collected during the week."   Defendant's counsel, having excepted to this portion of the charge, contend that the court erred in not instructing the jury that the word "settlement," as used in the contract, meant payment.   While the word "settlement" sometimes means an adjustment between persons concerning their dealings or difficulties, whereby a balance is ascertained to be due from one to the other, or an agreement is entered into which terminates their controversy, the word may also be construed to mean a payment of the amount found to be due on the examination of their mutual accounts according to the intention of the parties:   22 Am. & Eng. Enc. Law (1 ed.), 488 ;   *Fort* v. *Gooding*, 9 Barb. 371 ;   *Baxter* v. *State*, 9 Wis. 38 ;   *National Bank* v. *Norton*, 1 Hill, 572. We think an examination and consideration of the con-

tract as a whole shows that the word "settlement," as used therein, was intended by the parties as a payment of the amount ascertained to be due on the tenth of each month. It will be seen that plaintiff was required to pay the sum of ten cents per week for each copy of the newsdaper which he might deliver to subscribers whom he might secure ; and it was provided that upon a termination of the contract the subscription lists should be delivered to defendant, from which it was entitled to collect any balance due from plaintiff, but that, if such balance could not be collected from the subscribers, the surrender of the lists should not effect a complete "settlement" of defendant's account. The complete "settlement" to which reference has been made shows that the word in question, as there used, was intended by the parties to mean that the delivery of the subscription lists to the defendant was not to operate as a payment of any balance due from plaintiff to it, unless the same could be collected from the subscribers ; thus conclusively showing, we think, that, as elsewhere used in the contract, the word "settlement" means a payment, and plaintiff on the tenth of each month was required to pay for all the papers that he had delivered, except such as he was entitled to under the agreement.

The more difficult problem is whether the exception to the instruction complained of brings up for consideration the identical question passed upon by the trial court. The word "settlement," as before stated, is ambiguous, being susceptible of two meanings ; and, if standing alone, it might be difficult for the court, from an inspection of the contract, to say with any degree of certainty in which sense it was intended to be used by the parties. In such cases the rule is well settled that evidence *aliunde* the writings is admissible, not to vary or contradict the terms adopted, but to explain the meaning of that

which has been left vague and uncertain: *American Contract Co.* v. *Bullen Bridge Co.*, 29 Or. 549 (46 Pac. 138). The bill of exceptions does not contain any evidence that might ordinarily have been introduced, tending to explain the meaning of the word, from the absence of which it might be argued that it must be presumed that such evidence was admitted, and conclusively showed that the word "settlement" did not mean a payment, and, therefore, no error was committed in giving the instruction. Such a deduction would logically seem to follow, were it not for the fact that the contract, as hereinbefore interpreted, conclusively shows that the word under consideration was intended by the parties to mean a payment; and, this being so, the seeming ambiguity is resolved, thereby rendering any evidence tending to explain the meaning of the word inadmissible, and showing that such presumption cannot be invoked. The court having erred in giving this instruction, it follows that the judgment is reversed, and a new trial ordered.

REVERSED.

Decided 14 September; rehearing denied 17 October, 1898.

## BANK OF COLFAX *v.* RICHARDSON.

[54 Pac. 359.]

1. COLLATERAL ATTACK ON JUDGMENT.—The record of the proceedings of a superior court cannot be collaterally attacked for errors or irregularities appearing on its face, unless they affirmatively show an absence of jurisdiction.

2. JURISDICTION BY ATTACHMENT—NONRESIDENT.—In Oregon the preliminary seizure of the property of a nonresident in an action on a money demand is not a statutory prerequisite to jurisdiction; that requirement is entirely judicial.

3. JURISDICTION OVER ATTACHED PROPERTY OF NONRESIDENT.—In an action against a nonresident on a money demand, the actual seizure of property of the defendant under a lawful writ of attachment issued in such action confers jurisdiction over the property seized, as against a collateral attack, though there may be errors in the attachment proceedings, or in determining the liability of the property for the plaintiff's demand.

4. ACQUIRING JURISDICTION IN ACTIONS AGAINST NONRESIDENTS.—Under a system where the attachment is merely auxiliary to the main action, and the proceedings are the same against both resident and nonresident debtors, the authority to proceed to judgment depends upon the personal or constructive service of the court's process, and upon the actual seizure of the property to be affected by the judgment, and not upon the regularity of the attachment proceedings, or of any step after the service of the process.

5. COLLATERAL ATTACK ON JUDGMENT.—The judgment of a superior court against a nonresident acquired by a publication of summons cannot be attacked collaterally for any defect in the attachment proceedings, if such proceedings are not made by statute jurisdictional, unless the record affirmatively shows a want of jurisdiction; that is, if the seizure was complete and the court had authority to pass on the cause of action, the judgment is conclusive on the world, regardless of all irregularities or defects in the attachment or other proceedings.

6. COLLATERAL ATTACK—ISSUING SUMMONS BEFORE WRIT.—A judgment *in rem* against attached property in Oregon is not subject to collateral attack because the record does not affirmatively show that a summons was issued in the action at or before the issuance of the writ of attachment.

7. RETURN ON ATTACHMENT—LEAVING IN CONSPICUOUS PLACE.—Though Hill's Ann. Laws, § 149, provides that real property shall be attached, if there be no occupant, by leaving a copy of the writ in a conspicuous place thereon, it is enough, as against collateral attack on the resulting judgment, for the return to recite that the copy was left in a conspicuous place, without pointing out the place: *Hall* v. *Stevenson*, 19 Or. 153, distinguished.

8. RETURN—OWNERSHIP OF ATTACHED PROPERTY.—The omission of the return of a levy of attachment upon real property to state that the property attached was the property of the defendant in the writ, does not render it subject to collateral attack.

9. LEVY OF ATTACHMENT—ABSENCE OF OCCUPANT.—A return on a writ of attachment reciting that when the writ was served there was "no occupant thereof on the premises," should be construed to mean that the place was entirely unoccupied, rather than that the premises were actually occupied, but that the occupant was temporarily absent at the time of the officer's visit.

10. IDEM.—Under Hill's Ann. Laws, § 149, providing that real property may be attached by leaving a copy of the writ in a conspicuous place thereon, if there be no occupants, a valid attachment of real property may be made by leaving a copy of the writ in a conspicuous place thereon, if the officer at the time of visiting the land for the purpose of attaching it cannot find any one visibly in possession.

11. LEVY OF ATTACHMENT—LEAVING A COPY OF WRIT.—A return of an officer that he attached real estate by "posting" a copy of the writ in a conspicuous place thereon sufficiently shows, as against a collateral attack on a judgment, the "leaving" of a copy in such place.

12. OWNERSHIP OF PROPERTY BY DEFENDANT—AFFIDAVIT FOR ATTACHMENT.—An affidavit on which was based an order for publication of a summons sufficiently shows, as against collateral attack, that the nonresident defendants had property in the state, by a recital that the attachment was levied "on certain real property of the defendants, in B. County, Oregon:" *Pike* v. *Kennedy*, 15 Or. 420, cited.

13. AFFIDAVIT FOR ATTACHMENT—RESIDENCE OF DEFENDANTS.—An affidavit for publication of summons sufficiently shows, as against collateral attack,

that defendants could not be served in the state, by a statement that they reside in the State of Washington, and that at the time of making the affidavit they were not in Oregon: *Pike* v. *Kennedy*, 15 Or. 420, cited.

14. ORDER FOR PUBLICATION—RETURN OF "NOT FOUND."—A return of a summons "not found" is not a prerequisite of an order for service by publication, since Hill's Ann. Laws, ? 56, merely requires that the inability to serve the defendant within the state shall appear by affidavit. The provision of section 59, that when it appears by the return that defendant is not found the plaintiff may deliver another summons to be served, or may proceed by publication, does not modify section 59: *Goodale* v. *Coffee*, 24 Or. 346, cited.

15. ORDER FOR PUBLICATION—MAILING SUMMONS "FORTHWITH."—Though Hill's Ann. Laws, ? 57, provides that the order for publication of summons shall direct that a copy of the complaint and summons be deposited "forthwith" in the postoffice, addressed to defendant, the omission of the word "forthwith" is not fatal to the proceedings, as against collateral attack, when it appears that the copies were mailed within a reasonable time after the date of the order.

16. MAILING OF SUMMONS "FORTHWITH."—A summons is mailed "forthwith," under Section 57 of Hill's Ann. Laws, if it is deposited in the postoffice on the day of the first publication, provided such publication is within a reasonable time, as, say, a week, after the date of the order.

17. PROOF OF SERVICE OF SUMMONS.—A judgment is not invalid on collateral attack simply because the proof of service of summons is not annexed to or indorsed on the summons itself.

18. WHO MAY MAIL A PUBLISHED SUMMONS—CERTIFIED COPY.—Proof of the deposit of a copy of the complaint and summons in the postoffice pursuant to an order of service of publication need not be made by the sheriff or a person specially appointed therefor, but may be made by any one except the party himself; nor is it necessary that the copy of the summons so deposited shall be certified.

19. JUDGMENT ROLL—SUMMONS.—A judgment is not void and subject to collateral attack because the original summons does not appear in the judgment roll, where the proof of publication of summons as well as the findings and recitals in the judgment show that a summons was in fact issued.

20. FRAUDULENT CONVEYANCE — ATTACHMENT.— Real property fraudulently conveyed by a debtor is as much subject to attachment as though the conveyance had never been made.

21. FRAUDULENT CONVEYANCE—BURDEN OF PROOF AS TO GOOD FAITH.—The burden is upon the defendants, in an action by creditors to set aside a conveyance from an insolvent debtor to his children, to point out definitely the various items going to make up the indebtedness constituting the alleged consideration for the conveyance, where the conveyance and the circumstances under which it was made bear the semblance of an attempt to cover up the property of the debtor: *Marks* v. *Crow*, 14 Or. 382, approved.

From Benton :    J. C. FULLERTON, Judge.

Suit by the First National Bank of Colfax, Washington, against A. C. Richardson and others to set aside certain deeds, and subject the property to certain alleged

judgments said to have been theretofore obtained by said bank against certain of the defendants. There was a decree as prayed, from which defendants appeal.

AFFIRMED.

For appellants there was a series of briefs and an oral argument by *Messrs. Lawrence Flinn, John Burnett,* and *Arthur L. Frazer.*

For respondent there was a series of briefs over the name of *Cox, Cotton, Teal & Minor,* with an oral argument by *Mr. Wirt Minor.*

MR. JUSTICE BEAN delivered the opinion.

This is a suit to set aside a conveyance from A. C. and Laura R. Richardson to their minor children of certain lands in Benton County, on the ground that it was made for the purpose of defrauding creditors, and especially this plaintiff. The complaint avers, in effect, that on April 21, 1894, the plaintiff commenced three actions in the Circuit Court for Multnomah County—one against the defendant, A. C. Richardson, another against him and his wife, Laura R. Richardson, and the third against him and one J. T. Dook—to recover upon promissory notes of the respective defendants, and caused the real property in question to be attached in each of such actions; that such proceedings were had therein that the plaintiff recovered judgments against the defendants, wherein it was ordered that the property attached be sold, and the proceeds applied to the payment thereof; that a few days before the commencement of such actions, and after the indebtedness upon which they were based had accrued, the defendants, A. C. and Laura R. Richardson, with intent to injure and defraud the plaintiff, and without any consideration, conveyed the premises in question to their

minor children, who are made defendants in this suit.
The answer puts in issue the material allegations of the
complaint, and alleges that the conveyance referred to
was made for a valuable consideration, and in payment
of a debt due from the grantors to the grantees. At the
time the several actions referred to in the pleadings were
commenced and the judgments therein rendered, the
Richardsons were nonresidents of the state, and service
of the summons was had upon them by publication.

The plaintiff, at the trial, to maintain the issues on its
part, and to prove the existence of the several judg-
ments and orders of sale as alleged, offered in evidence
copies of the complaint, affidavit, and undertaking on
attachment, writ of attachment and return thereon, affi-
davit and order for publication of summons, proof of
publication and of deposit in the postoffice, and the
judgment in each of such actions, to the admission of
which the defendants objected for the reasons that (1) it
does not affirmatively appear in either case, except in
the affidavits for an order of publication, that a sum-
mons was issued at the time or before the writ of attach-
ment; (2) it does not appear that the writs of attachment
were served as required by law, or that the court ob-
tained jurisdiction to direct the service of the summons
by publication; (3) it does not appear that the proceed-
ings for the publication of the summons were regular,
or that the summons was ever issued or served in the
manner required by law. These objections were over-
ruled, and the records admitted in evidence, and of this
ruling the defendants complain.

The argument in support of the first objection is that,
the judgments in question having been rendered against
nonresidents of the state upon service of the summons
by publication, the facts essential to the jurisdiction
must affirmatively appear upon the face of the record,

and, since an attachment of the property of a nonresident is, under the doctrine of *Pennoyer* v. *Neff*, 95 U. S. 714, a necessary preliminary jurisdictional step in such cases, the record must affirmatively show, even on a collateral attack, that all the requirements of the statute in reference to the issuance and levy of attachment have been strictly complied with; and, as the writ cannot regularly issue before the summons (*White* v. *Johnson*, 27 Or. 282, 50 Am. St. Rep. 726, 40 Pac. 511), it is claimed that the judgments in question are void, because it does not affirmatively appear from any competent evidence that the summons had, in fact, been issued at the date of the writ.

1.    If this question were here on appeal from the judgments of the Circuit Court of Multnomah County, we might not find it easy to affirm them on satisfactory grounds; but we occupy no such position. The records are introduced collaterally as evidence to sustain the allegations of the complaint in the suit now pending, and we cannot, therefore, disregard them, or refuse to give effect to the judgments, on any other grounds than a want of jurisdiction in the court which rendered them. Any errors or irregularities in the records are of no avail in this proceeding unless they be such as show that the court had no jurisdiction. Our inquiry, therefore, must be confined to the question as to whether the error alleged affects the jurisdiction of the court, and in its consideration it is proper to bear in mind that there is no statute of this state making the seizure under an attachment or otherwise of the property of a nonresident an essential or necessary jurisdictional prerequisite in an action against him. We are not called upon, therefore, to consider the effect of the failure of the record in such an action to affirmatively show that all the statutory jurisdictional requirements have been complied with,

although even in such case the presumptions in favor of jurisdiction will often be sufficient to sustain the judgment when collaterally assailed : *Applegate* v. *Lexington Mining Co.*, 117 U. S. 255 (6 Sup. Ct. 742).

2. The rule requiring the property of a nonresident in an action on a money demand to be seized under a writ of attachment, and thus brought under the control of the court, before any steps are taken looking to the publication of the summons, is wholly a judicial, and not a legislative, requirement.

3. By the ruling in *Pennoyer* v. *Neff*, 95 U. S. 714, the proceedings in such an action, even if they conform strictly in every particular to the requirements of the statutes of this state, are ineffectual unless some property of the defendant in the state is brought, at the inception of the case under the control of the court, and subject to its disposition by a writ of attachment or other process adopted for that purpose ; and then only to the extent of adjudging that the property so seized is liable for the satisfaction of plaintiff's demand. In other words, the effect of that decision is that an action against a nonresident, who is not personally served with process within the territorial limits of the court, or does not appear in the action, is substantially and to all intents and purposes a proceeding *in rem*, and therefore the property to be affected by the adjudication must be brought under the control of the court in the first instance by an attachment, or some other equivalent act. The soundness of this doctrine is, of course, not to be questioned, but, in our opinion, its requirements are satisfied, and the court acquires sufficient jurisdiction of the *rem* to protect its proceeding from collateral attack, when the property of the defendant has been actually brought within the power and control of the court by a seizure under a lawful writ

of attachment issued in the action, although there may be irregularities, or even error, in the attachment proceedings.

4.   Under our system an attachment is merely auxiliary to the main action, and there is no difference in the proceedings thereon in an action brought against a nonresident, upon whom service is necessarily made by publication, and in one brought against a resident of the state, in which personal service is had.   In either case the proceedings on attachment have nothing to do with the merits of the cause of action or the jurisdiction of the court to try and determine the controversy between the parties.   If personal service is had, the cause becomes a mere action *in personam*, with the added incident that the property attached remains liable for any judgment the plaintiff may recover.   But, if service is had by publication, and there is no appearance for the defendant, the action is practically a proceeding *in rem* against the attached property, the only effect of which is to subject it to the payment of the amount which the court may find due the plaintiff.   Where no personal service is had, the *res* is brought within the power and control of the court by a seizure under a writ of attachment, but the right to adjudicate thereon is acquired only by the publication of the summons.   It is the substituted service, and not the seizure, which gives the court jurisdiction to establish by its judgment a demand against the defendant, and to subject the property brought within its custody to the payment of that demand.   In other words, the authority to hear and proceed to judgment depends upon the service of the process and the actual seizure of the thing to be concluded by the judgment, and not upon the regularity of the proceedings by which the control of the property was acquired.   When, therefore, the court has the *de facto* custody of the property by virtue of a *de facto*

writ of attachment, and a right to determine whether such property shall be subject to the payment of plaintiff's demand by virtue of constructive service of process, it has full and complete jurisdiction in the premises, and subsequent errors or irregularities in the proceedings will not be available on collateral attack. A judgment founded on service of process by publication is, of course, ineffectual unless it is an adjudication concerning property which the court has in its custody under some lawful process, because there is nothing upon which it can operate; but where the property has been actually seized and brought within the control of the court by some process authorized by law, and the right to determine its liability for the demands of the plaintiff is subsequently acquired by publication, an error of the court in determining the status of the property, or its liability, or the validity of the attachment, can, it seems to us, no more affect the jurisdiction, under a statute like ours, than an erroneous decision as to the amount of plaintiff's demand, or any other error in the case : Van Fleet, Coll. Attack, §§ 257, 838; *Paul* v. *Smith*, 82 Ky. 451; *Barelli* v. *Wagner*, 5 Tex. Civ. App. 445 (27 S. W. 17); *Thompson* v. *Eastburn*, 16 N. J. Law, 100; *Diehl* v. *Page*, 3 N. J. Eq. 143.

5. There is much conflict in the authorities generally as to whether the statutory prerequisites to the issuance of writs of attachment are jurisdictional, and must affirmatively appear to protect the proceedings from collateral attack, or whether, in the absence of any showing in the record to the contrary, it will be presumed that the steps necessary to vest the court with jurisdiction were taken. Mr. Waples states with apparent confidence that all the statutory requirements are jurisdictional, and are not to be presumed after judgment, even on a collateral attack, and cites a large number of cases

which more or less directly support the text (Waples, Attach. § 625) ; while Mr. Works, with equal confidence, says that, while there are authorities holding that such proceedings are special, and that no presumptions in favor of the jurisdiction of the court can be indulged, "the clear weight of authority and reason is to the contrary" (Works, Courts & Jur. p. 547) ; and this seems to be the view of Judge Van Fleet, as will be seen by reference to the citation from his work on Collateral Attack, already made.    An examination of the cases cited, however, will show that they are based largely, if not entirely, upon the peculiar provisions of the statute under consideration by the court, and it is therefore practically impossible to deduce from them any general rule upon the subject; and it is unnecessary for us in this case to attempt to do so, for, as we have already intimated, the necessity for an attachment, in the first instance, in an action brought in this state against a non-resident, is the outgrowth entirely of a decision of the Supreme Court of the United States, and not of any statute law or decision of this state ; and we therefore feel justified in following the adjudications of that court to the effect, as we understand them, that the judgment of a superior court against a nonresident cannot be attacked collaterally for any defect in the attachment proceedings, where such proceedings are not made, by statute, jurisdictional, unless the record affirmatively shows a want of jurisdiction.

In the leading case of *Galpin* v. *Page*, 85 U. S. (18 Wall.) 350, in which it is held that, where a judgment of a superior court relating to a matter falling within the general scope of its powers is produced, jurisdiction will be presumed in the absence of an affirmative showing to the contrary, but if, in rendering the judgment, the court was not proceeding according to the course of

the common law, or the judgment is against a nonresident who was not personally served within the territorial limits of the court, and did not appear in the action, the authority for its rendition must appear upon the face of the record, Mr. Justice Field says (page 371): "The qualification here made, that the special powers conferred are not exercised according to the course of the common law, is important. When the special powers conferred are brought into action according to the course of that law—that is, in the usual form of common-law and chancery proceedings—by regular process and personal service, where a personal judgment or decree is asked, or by seizure or attachment of the property where a judgment *in rem* is sought, the same presumption of jurisdiction will usually attend the judgments of the court as in cases falling within its general powers."

And this principle was applied in the case of *Voorhees* v. *Jackson*, 35 U. S. (10 Pet.) 449, in which the validity of certain proceedings in attachment against a nonresident were called in question collaterally on the ground that the record of the court in which the proceedings were had did not show that an affidavit for an attachment had been made and filed with the clerk before the writ issued, or that notice of the issuing of the attachment had been given by publication, or that the defendant had been called at three different terms of court, and the default recorded, or that the auditors had waited till the expiration of twelve months from the return of the writ before making the sale; all of which were specially required in the act regulating the proceedings under attachment. Now, that was a case of a proceeding *in rem*, without jurisdiction over the person, where the record produced failed to disclose that certain provisions of the statute material for the protection of the defend-

ant's rights had been complied with, and it was argued by counsel there, as here, that all of these requirements were conditions precedent, which must not only be performed before the court had power to order a sale, but that such performance must appear in the record; but the court, in reply to this argument, said: "The provisions of the law do not prescribe what shall be deemed evidence that such acts have been done, or direct that their performance shall appear on the record. * * * We do not think it necessary to examine the record in the attachment for evidence that the acts alleged to have been omitted appear therein to have been done. Assuming the contrary to have been the case, the merits of the present controversy are narrowed to the single question whether this omission invalidates the sale. The several courts of common pleas of Ohio, at the time of these proceedings, were courts of general jurisdiction, to which was added, by the act of 1805, power to issue writs of attachment, and order a sale of the property attached, on certain conditions. No objection, therefore, can be made to their jurisdiction over the case, the cause of action, or the property attached. * * * There is no principle of law better settled than that every act of a court of competent jurisdiction shall be presumed to have been rightly done till the contrary appears. * * * If the defendants' objections can be sustained, it will be on the ground that this judgment is false; and that the order of sale was not executed according to law, because the evidence of its execution is not of record. The same reason would equally apply to the nonresidence of the defendant within the state, the existence of the debt due the plaintiff, or any other creditor, which is the basis on which the whole proceedings rest."

Again, in *Cooper* v. *Reynolds*, 77 U. S. (10 Wall.) 308,

34 OR.—34.

where a defect in an affidavit for a writ of attachment, as well as the premature issuing of the writ, was set up to defeat the title to land sold under a judgment in an action against nonresidents who had been served with summons by publication, it was held that jurisdiction of the *res* was attained by the levy of the writ, and that the errors and irregularities pointed out were of no avail on a collateral attack.    Mr. Justice MILLER, after discussing the essential principles underlying the jurisdiction of the courts in proceedings by attachment against nonresidents who are not served with process within the territorial limits of the courts, and do not appear in the action, says : "Now, in this class of cases, on what does the jurisdiction of the court depend? It seems to us that the seizure of the property, or that which, in this case, is the same in effect, the levy of the writ of attachment on it, is the one essential requisite to jurisdiction, as it unquestionably is in proceedings purely *in rem.* Without this the court can proceed no further ; with it the court can proceed to subject that property to the demand of plaintiff. If the writ of attachment is the lawful writ of the court, issued in proper form under the seal of the court, and if it is by the proper officer levied upon property liable to the attachment, when such a writ is returned into court the power of the court over the *res* is established. The affidavit is the preliminary to issuing the writ. It may be a defective affidavit, or possibly the officer whose duty it is to issue the writ may have failed in some manner to observe all the requisite formalities ; but, the writ being issued and levied, the affidavit has served its purpose, and, though a revisory court might see in some such departure from the strict direction of the statute sufficient error to reverse the judgment, we are unable to see how that can deprive the court of the jurisdiction acquired by the writ levied upon defendant's property."

This case has been often quoted and approved by the supreme court, and is said in *Matthews* v. *Densmore*, 109 U. S. 216, 219 (3 Sup. Ct. 126), to be conclusive in regard to the validity of such proceedings when collaterally assailed. To the same effect, see *Harvey* v. *Tyler*, 69 U. S. (2 Wall.) 328; *Ludlow* v. *Ramsey*, 78 U. S. (11 Wall.) 581; *Grignon's Lessee* v. *Astor*, 43 U. S. (2 How.) 319.

6. The result of these cases is that the objection that it does not affirmatively appear that a summons was issued in the action brought by the plaintiff against the Richardsons in Multnomah County at or before the issuance of the writ of attachment, is of no avail in this suit.

7. It is next claimed that no valid attachments in such actions were made, and for that reason the court did not acquire jurisdiction of the *res*, and, therefore, had no power or authority to proceed against the defendants on a service of summons by publication. The statute (Hill's Ann. Laws, § 149) provides that: "Real property shall be attached by leaving with the occupant thereof, or, if there be no occupant, in a conspicuous place thereon, a copy of the writ certified by the sheriff;" and the return of the sheriff on the writs of attachment in question is that he executed the same on a certain date, "in Monroe Precinct, Benton County, Oregon, by posting a copy of said writ of attachment, prepared and certified to by me, as sheriff of said county, in a conspicuous place on the following described property [being the property in controversy], there being no occupant thereof on the premises." The contention for the defendants is that this return is insufficient, because it does not show the particular place where the copy of the writ was posted, or that the property was attached as the property of the defendants in the action, or that the premises were not in fact occupied at the time the at-

tempted levy was made, or that it was made by leaving a copy of the writ in a conspicuous place on the premises. Where, as in case of the location of a public highway, provision is made by statute for acquiring jurisdiction of the person by notices posted in a public or conspicuous place, it is probably necessary that the proof of posting show the particular places where the notices were posted, so that the court can say whether it was a public place or not. But in case of an officer serving a writ of attachment there is a natural presumption in favor of the discharge of official duty, and when he is required to post a notice in a conspicuous place, and certifies that he has done so, his certificate is sufficient, when questioned collaterally, without pointing out the particular place where the notice was posted : Waples, Attachm. § 334 ; *Porter* v. *Pico*, 55 Cal. 165 ; *Davis* v. *Baker*, 72 Cal. 494 (14 Pac. 102) ; *Lewis* v. *Quinker*, 2 Metc. (Ky.) 284 ; *Anderson* v. *Sutton*, 2 Duv. (Ky.) 480 ; *Head* v. *Daniels*, 38 Kan. 1, 10 (15 Pac. 911); *Hall* v. *Stevenson*, 19 Or. 153 (20 Am. St. Rep. 803, 23 Pac. 887), is not in conflict with this proposition, because —First, it was not a collateral attack ; and, second, the return of the sheriff was held insufficient because it did not show that the person to whom the copy of the writ was delivered was an occupant of the premises sought to be attached, or that the place where it was posted was a conspicuous place on the premises. There is no holding or intimation in the opinion that when a sheriff levies upon real property by leaving a notice in a conspicuous place thereon his return must show the particular place where he left the copy of the writ, or that it would not be sufficient in such a return for him to certify that he left it in a conspicuous place.

8. Again, it is claimed that the return under consideration is insufficient because it does not state that the

land attached was the property of the defendants in the writ. There is some apparent conflict in the authorities as to the effect of the omission of such a statement from an officer's return on a writ of attachment, and some of the earlier cases hold that it would be fatal to the attachment; but the decided weight of authority, as well as reason, seems to be that such a statement is not necessary to its validity, or to the jurisdiction of the court over the *res,* the presumption being that the officer obeyed the mandates of his writ, and, when he returned it with a certificate that in pursuance thereof he attached certain property, it is to be presumed that it belonged to the defendants in the writ, because he had no authority to attach the property of any one else : Drake, Attachm. §§ 207, 208 ; Waples, Attachm. § 314.

9. The claim is also made that the return does not show that the premises were unoccupied at the time they were attached. The statute requires an attachment of real property to be made by leaving with the occupant, if there be one, a copy of the writ, and, if not, by leaving it in a conspicuous place thereon. The language of the return under consideration is that there was "no occupant thereof on the premises" when the writ was served, and counsel argues that this is, in effect, a statement that the premises were actually occupied, but the occupant was temporarily absent at the time of the officer's visit. In view of the presumptions which always come to the aid of an imperfect or indefinite return of an officer, the construction of the return given by counsel is, in our opinion, untenable.

10. But, if it is sound, there is authority for holding that under the statute a valid attachment of real property may be made by leaving a copy of the writ in a conspicuous place thereon, if the officer, at the time of visiting

the land for the purpose of attaching it, cannot find any one visibly occupying the same : *Davis* v. *Baker*, 72 Cal. 494 (14 Pac. 102).

11.   Another objection to the sufficiency of the attachment is that the sheriff certifies that he made it by "posting" a copy of the writ in a conspicuous place on the premises, while the statute provides that real property shall be attached by "leaving" a copy of the writ in such a place.   But, in our opinion, when an officer certifies that in the discharge of a duty requiring him to leave a copy of a writ or other paper he performed such duty by posting the writ or paper, it is but reasonable to conclude in a collateral proceeding that he left it so posted, and thus complied with the requirements of the statute : *Lewis* v. *Quinker*, 2 Metc. (Ky.) 284, 287.   In support of the position of counsel, we are cited to *Lewis* v. *Botkin*, 4 W. Va. 533, and to *Matteson* v. *Smith*, 37 Wis. 333 ;   *Hall* v. *Graham*, 49 Wis. 553 (5 N. W. 943), and *Wilkinson* v. *Bayley*, 71 Wis. 131 (36 N. W. 836). These cases are not only direct attacks made in an appellate court upon the return of an officer, but they are based upon statutes entirely different from ours, and the decisions are expressly put upon the peculiar wordings of the statute.   Thus, for example, in *Lewis* v. *Botkin*, the statute requires the officer to "leave a copy posted at the front door of the place of abode of the defendant," and he returned that service was made by "posting an office copy hereof on the front door."   On a motion to quash, the return was held insufficient because it must be presumed that the legislature meant something more than mere posting by requiring the copy to be left posted, and that, in view of this provision of the statute, it could be true that the officer posted the copy, and yet not be true that he left it posted ;   but the court did not hold that, in the absence of such a statutory require-

ment, a court might not reasonably conclude from the certificate of an officer that he posted a notice at a certain place that he left it so posted.  The Wisconsin cases are based upon either a rule of court having the force and effect of a statute, or of a statute requiring proof of service to show that a copy of the summons was left with the defendant, as well as delivered to him ; and therefore it was held on appeal that a return which did not so state was insufficient.

12.  It is next claimed that the orders for publication of the summons in the actions brought against the Richardsons are void because (1) the affidavits upon which they are based did not tend to show that any diligence had been used to find the defendants in this state, or that they, or either of them, had property therein ; (2) no legal proof was made that the defendants could not be served in Multnomah County ; and (3) the orders for publication do not direct that a copy of the summons and complaint be deposited in the postoffice, as required by Section 57, Hill's Ann. Laws, "forthwith."  The affidavits for publication, after reciting the facts constituting plaintiff's cause of action, allege the commencement of the actions, the filing of the necessary affidavits and bonds for writs of attachment, the issuance thereof, and that "the same was, on the twenty-second day of April, 1894, duly executed by levying upon, and the attachment of, certain real estate of the defendants in Benton County, Oregon ; that said attachment has not been dissolved or discharged ; that the defendants are, and each of them is, a nonresident of the State of Oregon, and are, and each of them is, a resident of the State of Washington ; and they are now, and each of them now is, without the State of Oregon, and cannot be found within said state, even after diligent search ; and affiant therefore avers that personal service of summons cannot be

made upon defendants, or either of them, within the State of Oregon." Under the ruling in *Pike* v. *Kennedy*, 15 Or. 420 (15 Pac. 637), these averments are sufficient to sustain the order for publication on a collateral attack. In the case referred to the affidavit stated that the defendants, to secure the payment of a promissory note, executed a mortgage on certain real property in the City of Portland, Multnomah County, Oregon, and this was held a sufficient allegation that they did have property within the state. In the case at bar the statement is that certain real property of the defendants in Benton County, Oregon, had been theretofore attached, and this is obviously a more positive showing that defendants have property in the state than the one held good in *Pike* v. *Kennedy*.

13. So, also, in the latter case, it was averred that personal service could not be made upon the defendants in this state, for the reason that they had departed therefrom, "and now reside at Walla Walla, in the Territory of Washington," which was not absolutely inconsistent with their actually being within the state at the time; while in the affidavits under consideration the statement is that the defendants not only reside in the State of Washington, but there is a positive statement that at the time of making the affidavits they were not within the State of Oregon, and in this regard the showing is also more positive than the affidavit in *Pike* v. *Kennedy*.

14. Again, it is claimed that a valid order for service by publication can be made only after a summons has been placed in the hands of the sheriff, and returned, "Not found." But we find no such provision in the statute. It provides (section 56) that when service of the summons cannot be made as prescribed in the last preceding section, "and the defendant, after due diligence, cannot be found within the state, and when that

fact appears by affidavit to the satisfaction of the court
or judge thereof,   *   *   *   and it also appears that a
cause of action exists against the defendant, or that he
is a proper party to an action relating to real property in
this state,—the court or judge   *   *   *   shall grant an
order that the service be made by publication of a sum-
mons'' in certain designated cases.   This section pro-
vides when service may be made by publication, and
how the necessary jurisdictional facts for an order to that
effect shall be made to appear.   It does not provide that
before making the order it shall appear from the return
of the sheriff that the defendant cannot be found, but
that it shall so appear by affidavit to the satisfaction of
the court or judge thereof ;  and, when the requisite facts
thus appear, the court has jurisdiction to make the
order :   *Goodale* v. *Coffee*, 24 Or. 346, 354 (33 Pac. 990).
The method of service by publication is statutory, and it
is sufficient when the requirements of the statute, what-
ever they are, have been complied with.   It is claimed
by counsel, however, that the only legal evidence of the
fact that service of the summons cannot be made as pro-
vided ''in the last preceding section'' is a return of the
sheriff to that effect.   In support of this contention he
cites Section 59, Hill's Ann. Laws, which provides
''Whenever it shall appear by the return of the sheriff,
his deputy, or the person appointed to serve the sum-
mons, that the defendant is not found, the plaintiff may
deliver another summons to be served, and so on until
service be had ;  or the plaintiff may proceed by publi-
cation as in this title provided, at his election.''   But,
as we view it, this section has no bearing whatever on
the question under consideration.   It simply gives to the
plaintiff the right to issue an *alias* summons, or proceed
by publication, as he may elect, whenever it appears by
the return of the sheriff or deputy that the defendant is

not found; but it does not undertake to provide what the method of procedure shall be in case the plaintiff elects to proceed by publication. That is elsewhere provided in the statute.

15. The next objection is that, although the order for publication of the summons directs that a copy of the complaint and summons be deposited in the postoffice, addressed to the defendants at their place of residence, it does not order such deposit to be made "forthwith," as the statute (section 57) requires. The omission of the word "forthwith" from such an order, although required by the statute, is not regarded, on collateral attack, as fatal to the proceedings, when it appears that the copies were in fact mailed within a reasonable time after the date of the order: *Lyon* v. *Comstock*, 9 Iowa, 306; *Anderson* v. *Goff*, 72 Cal. 65 (1 Am. St. Rep. 34, 13 Pac. 73).

16. It is claimed, however, that the deposit in this case was not so made. The order for publication is dated July 13, and the publication was had in the first issue thereafter of the newspaper in which it was directed to be made,—on the twentieth,—and copies of the complaint and summons mailed to the defendants on the same day; and, in our opinion, this was a substantial compliance with the requirements of the statute, and was not such a delay as to oust the court of the jurisdiction otherwise rightfully obtained. The object to be accomplished by such a deposit in the postoffice, where the residence of the defendant is known, is to give him such notice, in connection with the publication itself, as will inform him that the suit is pending, so that he may have an opportunity to appear and defend, if he so desires; and this purpose is served, it seems to us, when the deposit is made in the postoffice as early as the first

publication, if such publication itself is made within a reasonable time after the date of the order.

17.   It is also claimed that the proof of publication and of the mailing is insufficient to sustain the judgment because (1) such proof is not attached to or indorsed on the original summons ; (2) the deposit in the postoffice was not made by the sheriff or his deputy, or by a person specially appointed by him or the court, but by an unofficial person ; and the affidavit in proof of such deposit does not show that a copy of the summons required to be published was deposited, or that such copy was certified to.   But these objections are each without merit. There is no principle of law rendering a judgment invalid on collateral attack simply because the proof of service of the summons is not annexed to or indorsed on the summons itself.

18.   Nor are we advised of any provision of the statute which requires the proof of a deposit of the complaint and summons in the postoffice, in pursuance of an order for service by publication, to be made by the sheriff or his deputy, or a person specially appointed for that purpose, or that the copy of the summons so deposited should be certified to by any one.   Section 54 of the statute designates the person by whom service of the summons shall be made when the defendant is found in the state, but it has no reference, as we interpret it, to the method of service by publication.   In the latter case the law requires a copy of the complaint and summons to be deposited in the postoffice, directed to the defendant, if his residence is known to the party making the application, or can with reasonable diligence be ascertained (section 57) ; but there is no provision that such deposit shall be made by any particular officer or person, and, in our opinion, it is sufficient if made by any adult

person competent to make the required proof thereof, except, probably, the party himself.

19.   It is also insisted that the judgment is void because the original summons does not appear in the judgment roll.   But there is likewise no merit in this objection.   The proof of publication, as well as the findings and recitals in the judgment of the court, shows that such a summons was, in fact, issued, and its omission from the judgment roll is, therefore, of no consequence at this time.

20.   And, finally, it is contended that the judgments upon which this suit was brought are void because the attached property had been transferred by the Richardsons to their co-defendants before the commencement of the several actions at law, and hence it is claimed that they had no interest therein which could be seized on attachment, and so the court did not obtain jurisdiction to render any judgment whatever.   A sufficient answer to this position is that the complaint in this suit avers that such transfer was made for the purpose of defrauding creditors, and as to the plaintiff it is, therefore, only an apparent, and not a real transfer.   As to it, the land still belonged to the fraudulent grantor, and was as much subject to attachment as though the fraudulent deed had never been made :   Waples, Attachm. § 249 ;   *Mulock* v. *Wilson*, 19 Colo. 296 (35 Pac. 532);   *Keene* v. *Sallenbach*, 15 Neb. 200 (18 N. W. 75);   *Williams* v. *Michenor*, 11 N. J. Eq. 520 ;   *Greenway* v. *Thomas*, 14 Ill. 271 ;   *Dewey* v. *Eckert*, 62 Ill. 218.

Having thus disposed of the numerous objections to the validity of the judgments upon which this suit is based, the only remaining question is one of fact to be determined from the testimony.   The court below found that the conveyance from the Richardsons to their minor children was fraudulent and void as to the plaintiff, and

this conclusion is, in our opinion, fully supported by the testimony. It is unnecessary to state the facts disclosed by the evidence in detail. It is sufficient that at and prior to the time of the conveyance in question the defendants Richardson were indebted to the plaintiff in the aggregate sum of more than $8,000, and to other parties in large sums, and were wholly insolvent; that before the date of the conveyance they were called upon by plaintiff to either pay or secure the indebtedness due it, and several conferences had been had between them and the officers of the bank in regard to the matter, during which the question of securing the indebtedness by a mortgage on the Oregon land was considered. While these negotiations were in progress, and while the bank was relying upon their honesty and good faith, they secretly conveyed their personal property in Washington to one of their hired men, a part of the stated consideration being wages alleged to be due him, took his note for the balance, and transferred it to one of their creditors; and also conveyed the Oregon land to their three minor children, the eldest of whom was at the time eighteen years of age, and the youngest ten, for the evident purpose, as we read the testimony, of preventing its seizure by their creditors.

It is true, the answer alleges, and the defendants A. C. and Laura R. Richardson undertook to claim, that the conveyance was made to their children in payment and satisfaction of a debt due them. The evidence which they offer in support of this defense is that in 1881 they received from the grandmother of the children three hogs of uncertain pedigree, but of the alleged value of $500, in trust under an agreement to care for them, and to account to the children for their increase, and the product thereof, whenever the grandmother should call upon them to do so; that at or about the time of the

conveyance in question they were called upon to render an account of their trust, and upon such accounting it was found they were indebted to their children in the sum of $10,415.66, and upon demand of the grandmother the conveyance was made in payment thereof. When it is remembered that this conveyance was made at a time when the defendants were insolvent, were being pressed by their creditors, and that the evidence discloses that the property received from the children's grandmother, if any, was used, managed, controlled, handled, and disposed of by the Richardsons at their pleasure; that no account whatever was kept in reference thereto, and no witness in the case has been able to give even approximately the several items going to make up the aggregate sum of $10,000; and the further fact that one of the grantees in the conveyance was not born until after the creation of such alleged trust,—it will be apparent that this defense, and the evidence in support of it, do not appeal very strongly to a court of equity.

21.    The conveyance, and the circumstances under which it was made, bear the semblance of an attempt to cover up the property, and it was, therefore, the defendant's duty to show that it was made in good faith, and for a valuable consideration.    Under such circumstances the defendants ought to be able to point out definitely the various items going to make up the alleged indebtedness.    As said by Mr. Justice THAYER in *Marks* v. *Crow*, 14 Or. 382 (13 Pac. 55): "Any other rule, where property has been shifted from one member of a family to another, and creditors left unprovided for, would lead to the most flagrant frauds.    The creditors could not show that the indebtedness claimed to be the consideration of the transfer did not exist.    They could do no more than to inquire when and under what circumstances it was created; and, unless the recipient of the property

could give a clear and precise account of the items constituting it, they should have the right to ask the court to infer that it was a sham and pretense; otherwise property might be put beyond the reach of creditors with impunity." Fraudulent intent is a question of fact, but it is agreed that it may be inferred from the facts and circumstances surrounding the transaction. It sometimes — and often, indeed — happens that the surrounding circumstances quite as satisfactorily explain the true inwardness of the transaction, and import knowledge of its object or of the intended fraud, as any other character of testimony. It follows that the decree of the court below must be affirmed, and it is so ordered.

Affirmed.

Decided 27 March; rehearing denied 21 April, 1899.

## McCORNACK *v.* SALEM RAILWAY COMPANY.

[56 Pac. 1022.]

Insolvency— Preferred Claim— Operating Expense.*—A claim for the purchase price of apparatus and appliances furnished to a street railway company which enhanced the value of its property, but were not necessary to keep the enterprise a going concern, is not entitled, after the appointment of a receiver for the company, to a preference over a prior mortgage. The test of preferability is the actual necessity for the article furnished; if the mortgaged property could not be safely used without it, there is a preference for its price, othewise not.

---

*Note.—With the case of *Green* v. *Coast Line R. R. Co.*, 54 Am. St. Rep. at pp. 400-433, is a monograph entitled "Claims Which Take Precedence Over Mortgages of Railways and Like Property."

On the point of allowing preferential payment of Operating Expenses and Back Claims, see 54 Am. St. Rep. pp. 405-413, and as to Construction Claims, Machinery, etc., see pp. 415-418, 420.

For a presentation of the applicability of this rule to Private Corporations, see 54 Am. St. Rep. p. 432.

As to whether Judgments for Personal Injuries recovered against a corpora-

From Marion :   Henry H. Hewitt, Judge.

tion prior to the appointment of a receiver at the instance of unpaid mortgagees will take precedence over the mortgage, see *St. Louis Trust Co.* v. *Riley*, 30 L. R. A. 456 (70 Fed. 32, 16 C. C. A. 610) and *Green* v. *Coast Line R. R. Co.*, 33 L. R. A. 803, 54 Am. St. Rep. at pp. 425-429.—Reporter.